ACCEPTED
15-25-00010-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
5/22/2025 4:39 PM
CHRISTOPHER A. PRINE
CLERK

**CASE NO. 15-25-00010-CV**

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
5/22/2025 4:39:13 PM
CHRISTOPHER A. PRINE
Clerk

IN THE COURT OF APPEALS
FOR THE FIFTEENTH JUDICIAL DISTRICT
AUSTIN, TEXAS

TEXAS HEALTH AND HUMAN SERVICES COMMISSION,
*Appellant,*

v.

SHANRESSA CRADDOCK
*Appellee.*

**APPELLEE'S BRIEF**

**LONE STAR LEGAL AID**

By: /s/ Elizabeth E. Ewing
Elizabeth E. Ewing, Attorney in Charge
Texas Bar #24092396
164 6th SE
Paris, Texas 75460
Telephone: 903-785-8711
Fax: 903-785-5990
Email: eewing@lonestarlegal.org

David Beyleryan
Texas Bar #24087164
Email: dbeyleyan@lonestarlegal.org

Attorneys for Appellee, Shanressa Craddock

1

# IDENTITY OF PARTIES AND COUNSEL

Appellant:                Texas Health and Human Services Commission

Appellee:                Shanressa Craddock, an individual resident of Mt. Pleasant, Texas

Attorneys for Appellant: Jennifer Cook
Texas Bar #00789233
Assistant Attorney General
General Litigation Division
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: 512-475-4098
Email: Jennifer.cook@oag.texas.gov
Fax: 512-320-0667

Attorneys for Appellee: Elizabeth E. Ewing,
Texas Bar #24092396
Lone Star Legal Aid
164 6th SE
Paris, Texas 75460
Telephone: 903-785-8711
Fax: 903-785-5990
Email: eewing@lonestarlegal.org

David Beyleryan
Texas Bar #24087164
Lone Star Legal Aid
Email: dbeyleryan@lonestarlegal.org

## TABLE OF CONTENTS

**IDENTITY OF PARTIES AND COUNSEL** .......................................................2

**INDEX OF AUTHORITIES** .........................................................................5

**STATEMENT OF THE CASE** .......................................................................7

**STATEMENT REGARDING ORAL ARGUMENT** ..........................................8

**ISSUES PRESENTED** ................................................................................9

**STATEMENT OF FACTS** .........................................................................10

**SUMMARY OF THE ARGUMENT** ..............................................................12

**ARGUMENT** ..........................................................................................15

   **I. HHSC's Decision Was Not Supported by Substantial Evidence.** ...............16

     **A. HHSC bore the burden to justify its denial, and it failed to meet that burden.** ........................................................................................16

     **B. HHSC failed to conduct the investigation required by law.** ...................18

     **C. HHSC's decision is not supported by substantial evidence because it relied on a policy that contradicts binding law.** ...........................................22

     **D. HHSC's decision was arbitrary and capricious because it ignored uncontroverted evidence in the record.** ........................................................24

**E. Summary: HHSC's decision was unsupported, unreasonable, and contrary to law.**........................................................................26

**II. HHSC committed legal error by applying internal policy instead of the controlling regulation.**...............................................................27

**III. HHSC's internal policy conflicts with federal law and is therefore preempted.**..........................................................................28

**CONCLUSION**........................................................................29

**PRAYER** ...............................................................................30

# INDEX OF AUTHORITIES

**Constitutions**

United States Constitution Article 6, Clause 2.......................................................28

**Statutes – Federal**

7 U.S.C. § 2016(e).................................................................................13, 28
7 U.S.C. § 2020(b)..............................................................................9, 13, 28

**Statutes – State**

Texas Government Code § 22.220...................................................................15
Texas Government Code § 2001.171................................................................15
Texas Government Code § 2001.174................................................................15
Texas Government Code § 2001.174(2)(D)....................................................15, 27
Texas Government Code § 2001.174(2)(E)....................................................15, 24
Texas Government Code § 2001.174(2)(F)....................................................15, 24
Texas Civil Practice and Remedies Code § 51.012...............................................15

**Regulations – Federal**

7 C.F.R. § 273.17.......................................................................................9
7 C.F.R. § 273.17(a)(1).........................................................................13, 28
7 C.F.R. § 274.6(b)(2)...........................................................................23, 24
7 C.F.R. § 276.2(b)(7)...........................................................................18, 20
7 C.F.R. § 277.18(m)..................................................................................28
7 C.F.R. § 277.18(m)(1)..............................................................13, 17, 18, 20

**Regulations – State**

1 Texas Administrative Code § 357.9................................................... 16
1 Texas Administrative Code § 372.1519............................…..…....... 16, 18, 23
1 Texas Administrative Code § 372.1521……………………. 13, 17, 19, 20, 24, 27
1 Texas Administrative Code § 372.1521(a)…………....................…… 18, 20
1 Texas Administrative Code § 372.1601…………………………............9

**Agency Handbooks**

Texas Works Handbook § B-341……………….…………9, 13, 20, 22, 27, 28, 29
Fair and Fraud Hearings Handbook § A-1130.........................................................16

**Rules**

Texas Rules of Appellate Procedure 9.4.................................................................31

**Cases**

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
	505 U.S. 88 (1992)……………………………………….......…….28

*Lewis v. Metropolitan Sav. And Loan Ass'n*,
	550 S.W.2d 11 (Tex. 1977)........................................................................16

*Mont Belvieu Caverns, LLC v. Tex. Comm'n on Envtl. Quality*,
	382 S.W.3d 472 (Tex.App. Austin 2012, no pet.)………………….......….24

*Olivarez v. Aluminum Corp. of America*,
	693 S.W.2d 931 (Tex. 1985)................................................................15, 16

*Pub. Util. Comm'n of Texas v. Gulf States Utils. Co.*,
	809 S.W.2d 201 (Tex. 1991)...........................................................15, 16, 19

*Tex. Dep't of Pub. Safety v. Stanley*,
	982 S.W.2d 36 (Tex. App.—Houston [1st Dist.] 1998, no pet.)………........24

*Tex. Health & Hum. Servs. Comm'n v. Estate of Burt*,
	No. 22-0437, 2024 WL 1945484 (Tex. May 3, 2024)………………….23, 27

## STATEMENT OF THE CASE

This appeal arises from a judicial review of the Texas Health and Human Services Commission's ("HHSC") denial of a request by Appellee, Shanressa Craddock, for restoration of Supplemental Nutrition Assistance Program ("SNAP") benefits that disappeared from her Electronic Benefit Transfer ("EBT"), also known as a Lone Star Card. [CR at 4-5]. Ms. Craddock always retained physical possession of her Lone Star Card and promptly reported the unauthorized transaction to HHSC. [AR at 74]. HHSC denied her request, determining that no system error occurred and that its policy did not permit restoration of benefits unless the card was reported stolen before the theft occurred. [AR at 39-44].

Ms. Craddock sought judicial review in the 250th Judicial District Court of Travis County. [CR at 4]. After briefing and oral argument, the trial court reversed HHSC's decision, finding that the agency's conclusion was not supported by evidence and conflicted with applicable law and policy. [CR at 126]. The district court held that the Agency's decision was based on an internal agency handbook policy that conflicts with state and federal law. *Id.* The district court reversed the Agency's final decision to not restore the $930 in SNAP benefits that the Agency concluded were stolen from Craddock's Lone Star account by an unknown third party. *Id.* The Agency, HHSC, now appeals the 250th District Court's judgment to the Fifteenth Court of Appeals.

## STATEMENT REGARDING ORAL ARGUMENT

Appellee waives oral argument and believes the issues in this appeal can be resolved on the briefs and record alone. The controlling legal standards are well established, and the arguments have been fully presented in the parties' written submissions.

# ISSUES PRESENTED

1.  Whether the decision of HHSC to deny restoration of SNAP benefits stolen from the Electronic Benefits Transfer ("EBT") system used by HHSC in the administration of the SNAP program from Appellee was unsupported by substantial evidence and contrary to law in this case where:
    a.  HHSC based its decision entirely on an internal Handbook provision (Texas Works Handbook § B-341) about lost or stolen Lone Star Cards;
    b.  There was absolutely no evidence that Appellee's Lone Star Card was lost or stolen;
    c.  HHSC failed to investigate system error as required by federal and state law; AND
    d.  The evidence shows that the loss of the benefits could not have occurred except by system error.

2.  Whether HHSC's reliance on its internal policy manual (Texas Works Handbook § B-341) unlawfully conflicts with binding state and federal law that mandates benefit restoration following underissuance or system errors, including 1 T.A.C. § 372.1601, 7 U.S.C. § 2020(b), and 7 C.F.R. §§ 273.17.

3.  Whether HHSC's fair hearing decision placed the burden of proof regarding system error or fraud on Plaintiff, in violation of state and federal laws that place burden of proof on HHSC in a SNAP appeal and require the agency, not recipients, to bear the risk of security breaches and unauthorized transactions caused by weaknesses in the EBT system.

**STATEMENT OF FACTS**

Appellee, Shanressa Craddock, is a SNAP recipient who, in August 2022, experienced a loss of $930.00 in benefits due to fraudulent activity on her EBT account. [AR at 13, 68]. The transaction was unauthorized and occurred at a Sam's Club located several counties away from her home. [AR at 68]. Ms. Craddock had never visited that location, was at work at the time of the transaction, and retained physical possession of her Lone Star card throughout. [AR at 69, 74].

On August 19, 2022, Ms. Craddock received a text message from an @yourtexasbenefits.com contact, stating her card was blocked and instructing her to call a listed phone number. [AR at 35, 70]. Believing the message was legitimate, she called the number. [AR at 70]. It was an automated system, not a live agent. [AR at 70]. She followed the prompts and entered her card number and PIN. *Id.* At no point did Ms. Craddock have a conversation or knowingly disclose or discuss her credentials to another person, as the undisputed evidence in the record clearly reflects. *Id.*

The next day, on August 20, 2022, the unauthorized $930 transaction was processed. [AR at 13, 68]. On August 21, 2022, Ms. Craddock attempted to use her Lone Star Card at the grocery store and discovered only $0.54 remained. [AR at 74]. She immediately contacted the Lone Star Help Desk to report the fraudulent transaction, disputed the charge, and requested restoration of her benefits. *Id.*

10

HHSC denied her request in a letter dated September 7, 2022, asserting no system error occurred. [AR at 11]. No information regarding an investigation was included. *Id.*

Ms. Craddock appealed the denial, and a fair hearing was held on October 7, 2022. [AR at 39-44]. At the hearing, she testified that she did not lose her card, did not authorize the transaction, and did not speak to any individual when she responded to the text message – she was only prompted to input her PIN and card number and did so under the guise that it was HHSC. [AR at 70, 74]. She also testified that she contacted HHSC, the USDA, local law enforcement, and the retailer to report the theft. [AR at 68-69]. The hearing officer upheld HHSC's denial. [AR at 39-44].

Ms. Craddock timely requested administrative review, which was denied, and she subsequently filed a petition for judicial review. After full briefing and oral arguments, the 250th Judicial District Court of Travis County, Texas ruled in favor of Ms. Craddock, finding HHSC's decision was unsupported by substantial evidence and contrary to law. HHSC now appeals that ruling to this Court.

## SUMMARY OF THE ARGUMENT

This case turns not on whether Ms. Craddock was the victim of fraud (HHSC concedes she was), but on whether the agency complied with the law when it denied her request for restoration of stolen SNAP benefits. The trial court correctly held that HHSC's decision was not supported by substantial evidence and violated state and federal law.

The agency's denial was based solely on the fact that a valid PIN and card number were used, and not on any investigation into whether the transaction was the result of system error, cloned card usage, or EBT system compromise. [AR at 67]. That failure violates HHSC's regulatory obligations under both federal and state law, which require restoration of benefits in the case of underissuance caused by administrative or system error.

Appellant HHSC wrote a thorough and convincing brief about a lost or stolen Lone Star Card, but there is no evidence of a lost or stolen card. In a nutshell, the dispute in this case is about how to apply the law to the facts of this case – a security breach of information and error in EBT card identification due to phishing, not due to a lost or stolen card.

Federal law holds state agencies strictly liable for financial losses caused by EBT system errors, including unauthorized access and transaction processing

12

failures. 7 U.S.C. §§ 2016(e), 2020(b); 7 C.F.R. §§ 273.17(a)(1), 277.18(m)(1). Texas law similarly requires agencies to evaluate all components of their EBT systems when an unauthorized transaction is reported. 1 Tex. Admin. Code § 372.1521. HHSC did not comply with that duty in this case.

Instead, HHSC's denial rested on internal policy, Texas Works Handbook § B-341, that the trial court correctly found to be outdated, unworkable, and in conflict with governing law. That reliance deprived Ms. Craddock of benefits she was entitled to receive and shifted the burden of securing HHSC's infrastructure onto individual recipients, in direct conflict with binding legal authority.

Ms. Craddock never lost her card, never spoke to a person about her credentials, and promptly reported the fraudulent transaction after discovering it. The hearing record reflects that she was the victim of a scam that exploited HHSC's EBT infrastructure. Yet, HHSC conducted no investigation into whether its system was exploited. It relied solely on the fact that the correct card number and PIN were used, ignoring its own regulatory obligation to evaluate system error.

All of the Agency's legal arguments are woven around the report of a stolen card. This case did not involve a stolen Lone Star Card. There is no evidence of a stolen card. HHSC admits that but then weaves all their arguments around failure to report a stolen card. All the regulations they cite say "stolen card," not

13

"compromised system" or "fraudulently obtained information." The agency failed to address the issue of security measures at the point of electronic interface - release of money by HHSC's system to a retailer when no Lone Star Card was presented. They don't - and can't - cite to any HHSC Handbook provision about loss of SNAP benefits through an information system error or card reader insecurity when there has been no stolen card. It is clear from the record that their computer system released SNAP benefits when no legitimate Lone Star Card was placed in a card reader by a SNAP recipient.

By failing to conduct the required system-level inquiry and by applying an internal handbook policy that conflicts with controlling state and federal law, HHSC acted outside of its discretion, in conflict with its own regulatory duties, and unlawfully placed the burden of its system failure on the individual recipient. The trial court correctly reversed HHSC's decision to deny restoration of benefits and found that HHSC's policy conflicts with state and federal law. This Court should affirm.

## ARGUMENT

This appeal arises from a final judgment following judicial review under the Texas Administrative Procedure Act ("APA"). Tex. Gov't Code § 2001.171. The court of appeals has jurisdiction under Texas Government Code § 22.220 and Texas Civil Practice and Remedies Code § 51.012.

Under the APA, the reviewing court shall reverse or remand the agency decision if it is not supported by substantial evidence or if it is arbitrary, capricious, or characterized by abuse of discretion. Tex. Gov't Code § 2001.174. Substantial evidence is more than a mere scintilla and must be such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Olivarez v. Aluminum Corp. of America*, 693 S.W.2d 931, 932 (Tex. 1985).

Substantial evidence must be more than a bare conclusion; it requires meaningful engagement with the facts and applicable law. *Pub. Util. Comm'n of Texas v. Gulf States Utils. Co.*, 809 S.W.2d 201, 211-212 (Tex. 1991) (holding that conclusory testimony citing only one factor was insufficient to support agency decision, and that substantial evidence requires consideration of all relevant factors in the record). While courts defer to agencies within their expertise, they do not abandon their responsibility to ensure justice is done. "It remains the business of the courts to see that justice is administered to competing parties by governmental

15

agencies." *Lewis v. Metropolitan Sav. And Loan Ass'n*, 550 S.W.2d 11, 13 (Tex. 1977).

## I. HHSC's Decision Was Not Supported by Substantial Evidence.

### A. HHSC bore the burden to justify its denial, and it failed to meet that burden.

HHSC had the legal obligation to support its denial of benefits with affirmative evidence. It failed to do so, and as a result, the trial court correctly found that its decision was unsupported by substantial evidence.

Under Texas law, the agency bears the burden of proof in a SNAP appeal. 1 Tex. Admin. Code § 357.9 Fair and Fraud Hearings Handbook § A-1130. This includes presenting actual evidence to support its findings, not assumptions, not internal policies, and not conclusory testimony by agency witnesses. Substantial evidence means more than a mere scintilla; it must be relevant and credible enough that a reasonable person could reach the same conclusion as the agency. *Olivarez v. Aluminum Corp. of America*, 693 S.W.2d 931, 932 (Tex. 1985). A presumption of correctness is not enough. *Pub. Util. Comm'n of Texas v. Gulf States Utils. Co.*, 809 S.W.2d 201, 211-12 (Tex. 1991) (agency must engage with the full factual record).

When benefits go missing due to suspected fraud or system error, the agency is required to investigate, not assume. Texas law specifically requires HHSC to

16

evaluate whether any component of its EBT system malfunctioned before denying a request for restoration. 1 Tex. Admin. Code § 372.1521. This duty reflects the principle that the agency, not the recipient, controls the infrastructure and must bear the responsibility for keeping it secure. The Code of Federal Regulations in Title 7, Section 277.18(m)(1) requires the same – states are responsible for their systems.

Here, HHSC denied Ms. Craddock's request for benefit restoration without conducting a system-level inquiry. The record shows that the agency based its conclusion solely on the fact that a correct card number and PIN were used. It presented no documentation of any investigation into the possibility of card cloning, skimming, employee scamming, or system vulnerability. HHSC made no effort to explore whether its own infrastructure had been exploited despite the agency's exclusive control over the systems involved. Instead of investigating, HHSC made a conclusory pronouncement.

Despite Ms. Craddock's uncontroverted testimony that she maintained control of her card, did not knowingly or intentionally disclose her PIN and card information to any person, and reported the theft immediately upon discovery, HHSC denied her claim based solely on its internal policy procedure regarding stolen cards. The agency's hearing officer acknowledged that the transaction occurred without the use of Ms. Craddock's physical Lone Star Card, yet upheld

17

the denial based on internal policy. [AR at 77-79].[1] The record contains no evidence or proof that the system functioned without error when it disbursed funds without a Lone Star Card, and no reasonable person, reviewing this record, could reach the conclusion that there was no system error.

HHSC failed to meet its burden of proof. Its decision was not grounded in evidence but in assumption, conclusions, and internal policy. The trial court properly reversed the agency's denial based on the absence of substantial evidence. This Court should affirm.

**B. HHSC failed to conduct the investigation required by law.**

Texas law requires that HHSC evaluate all components of the EBT system for system error when an unauthorized transaction is disputed. 1 Tex. Admin. Code § 372.1521(a). Federal regulations impose similar duties. State agencies are responsible for maintaining the security of information systems involved in the administration of SNAP, including points of electronic interface and benefit issuance. 7 C.F.R. §§ 276.2(b)(7), 277.18(m)(1). These rules reflect a critical principle: when public benefits are administered through electronic systems, the

---

[1] Hearing Transcript at AR 77-79. The hearing officer stated: "*It sounds like you're a victim of a crime . . . you have to go through some hurdles to get justice here . . . I think you have a very good case.*" (emphasis added). Despite this acknowledgment, the agency upheld its denial without any documented investigation into system-level error or unauthorized card duplication.

administering agency must ensure the integrity and accountability of those systems.

HHSC did not evaluate all components of anything. Its witness, Sandra Sosa, testified that agency policy is to assess only whether the card number and PIN were correct. [AR at 66-67]. This approach of only checking card and PIN numbers ignores the agency's responsibility to evaluate the multiple points of system operation found in 1 Tex. Admin. Code § 372.1521. She concluded, without presenting supporting documentation, that there was no system error, simply because the inputs matched. But conclusory testimony is not substantial evidence. *Pub. Util. Comm'n of Texas v. Gulf States Utils. Co.*, 809 S.W.2d 201, 211-12 (Tex. 1991).

The agency's entire legal theory hinges on the notion that this was a "stolen card" case. It was not. Ms. Craddock's Lone Star Card was never lost or stolen. [AR at 74]. HHSC admits that. Yet every policy, every citation, and every legal argument HHSC offers is based on the scenario of a card theft – not a system compromise or cloned-card transaction. They offer no Handbook provision, rule, or regulation that accounts for losses caused by information security failures or card-reader vulnerabilities. They did not address the most basic reality in the record: $930 in SNAP benefits were issued through HHSC's system without the physical

presentation of the recipient's actual Lone Star Card. That is, by definition, a system error.

At the hearing, HHSC offered no evidence of a forensic review, no contact with its EBT contractors, no log analysis, and no review of the electronic interface that allowed this transaction. Its internal policy, Texas Works Handbook § B-341, simply assumes system integrity unless the card was reported stolen first. But that policy has no language that addresses what happens when the card is *not* stolen. It fails to comply with 1 Tex. Admin. Code § 372.1521, which requires HHSC to investigate the system itself, not just confirm data inputs.

The agency also made no effort to address or even acknowledge the broader pattern of security breaches that have affected its SNAP EBT systems in recent years, including ongoing internal investigations and terminations. [2] This context matters. The agency cannot claim there was "no system error" without performing any system review, especially when the only evidence in the record shows that its system issued public funds to a retailer without a valid Lone Star Card.

And while HHSC repeatedly argues it "had nothing to do" with the scam, it fails to explain how a criminal knew Ms. Craddock's phone number, that she was a

---

[2] Tex. Health & Hum. Servs. Comm'n, *HHSC Notifies Additional Individuals Regarding Privacy Breach* (Apr. 30, 2025), https://www.hhs.texas.gov/news/2025/04/hhsc-notifies-additional-individuals-regarding-privacy-breach.

SNAP recipient, and the precise data necessary to exploit her account. This was not a random phishing attempt, it was a targeted breach of confidential data tied directly to HHSC's role as benefit administrator.

The statutes and regulations cited by HHSC make clear that the responsibility for secure administration rests with the agency – *not* the victims of system abuse. This is not a fact dispute about negligence. It is a legal failure to comply with governing rules. This contradiction is evident in HHSC's own appellate briefing, where it cites federal regulations affirming its duty to maintain their Information Systems and information processing in their administration of the SNAP program while denying any such responsibility in this case.[3] HHSC argues that they were not responsible for the security and processing of that information in this case, where there was obviously a breach of security when the system released SNAP benefits without the presentation of a legitimate Lone Star Card into the card reader. There is evidence that the SNAP system paid out $930 of SNAP benefits to a retailer in Fort Worth when Craddock's Lone Star Card was not there, and their SNAP system was designed to not pay out except on the presentation of a Lone Star Card. That is evidence of system error. That is the only evidence in the

---

[3] Brief for Appellant at 24, *Tex. Health & Hum. Servs. Comm'n v. Craddock*, No. 15-25-00010-CV (Tex. App. Austin Apr. 22, 2025) ("[HHSC is] responsible for the security of their Information Systems in the administration of SNAP." (citing 7 C.F.R. § 277.18(m)(1)) (arguing that HHSC is responsible for system security in general, while simultaneously disclaiming any responsibility for the specific security failure in this case)).

21

record, and it is about system error in the release of $930 in Craddock's SNAP benefits.

The Agency's system and Handbook seem unable to address computer scams arising from information security gaps. The world and technology are rapidly changing, but the regulations cited by the HHSC Appellant put the obligation clearly on HHSC. This is not a fact question about who the negligent or bad guy is; it is a question of what the law says.

HHSC relied on an internal policy that conflicts with binding state and federal law. Even if the agency's conclusory statements were taken as more than a scintilla of evidence, its decision cannot be upheld if it relies on the only legal authority cited, Texas Works Handbook § B-341, which conflicts with state and federal law.

**C. HHSC's decision is not supported by substantial evidence because it relied on a policy that contradicts binding law.**

Rather than apply the legal standard required by statute and regulation, HHSC relied exclusively on Texas Works Handbook § B-341 to justify its denial. That policy, however, does not have the force of law and cannot override governing state and federal rules. Where the only "support" for the agency's position is an internal guideline that conflicts with controlling law, the decision cannot be sustained under the substantial evidence standard.

An agency cannot rely on internal manuals or guidance when they contradict binding statutes or administrative code provisions. See *Tex. Health & Hum. Servs. Comm'n v. Estate of Burt*, No. 22-0437, 2024 WL 1945484, at 7 (Tex. May 3, 2024) ("Manual does not have the force and effect of law; it is the statute that controls."). State regulations require HHSC to evaluate all components of the EBT system. 1 Tex. Admin. Code § 372.1521(a). Federal law similarly holds agencies strictly responsible for system integrity and recovery of unauthorized disbursements. See 7 C.F.R. §§ 276.2(b)(7), 277.18(m)(1).

Here, HHSC applied the Handbook mechanically, without regard for Ms. Craddock's specific facts or the regulatory requirements. The agency admitted the card was never stolen yet denied the claim under a provision that applies only to stolen cards.

Additionally, HHSC now relies on 1 Tex. Admin. Code § 372.1519 and 7 C.F.R. § 274.6(b)(2) for the first time on appeal to defend its policy that benefits may not be restored unless a card is reported lost or stolen before use. Appellant's Br. at 12-14. But these provisions were never cited in the administrative record or in HHSC's briefing below. The trial court referenced Section 1519 as one of several reasons the agency's policy is unworkable in modern EBT fraud cases. In any event, neither provision supports HHSC's position. Section 1519 addresses card replacement, not system error or restoration. Its counterpart, Section

23

372.1521, specifically governs system errors and requires HHSC to evaluate whether agency or contractor error occurred. These rules must be read together, not in isolation. *Mont Belvieu Caverns, LLC v. Tex. Comm'n on Envtl. Quality,* 382 S.W.3d 472, 486 (Tex.App. Austin 2012, no pet.) And 7 C.F.R. § 274.6(b)(2), which concerns household misfortunes like flood or fire, does not apply where benefits are stolen through cloned card use and data compromise. The trial court correctly found that HHSC's policy was outdated, unworkable, and in conflict with law. This Court should affirm.

**D. HHSC's decision was arbitrary and capricious because it ignored uncontroverted evidence in the record.**

HHSC's denial of benefits cannot be sustained where the agency ignored or discounted clear, credible, and uncontroverted evidence presented by Ms. Craddock. Its refusal to engage with the simple facts of the case renders its decision arbitrary and capricious under Texas law.

An agency's decision must be supported by substantial evidence and may not be arbitrary or capricious. Tex. Gov't Code § 2001.174(2)(E), (F). Substantial evidence includes all relevant evidence in the record, and an agency may not disregard credible testimony without a reasoned basis. See *Tex. Dep't of Pub. Safety v. Stanley*, 982 S.W.2d 36, 37 (Tex. App.—Houston [1st Dist.] 1998, no pet.).

24

An administrative decision that fails to consider or address uncontroverted facts, especially those that go directly to the central issue, is not entitled to deference. The hearing officer may weigh evidence but cannot selectively ignore key testimony without explanation or contrary proof.

Ms. Craddock testified that she never lost her Lone Star Card and never gave it to another person. [AR at 74]. She reported the theft promptly, contacted multiple authorities, and was at work at the time of the disputed transaction. [AR at 68–74]. HHSC offered no evidence contradicting any of these facts. Even the hearing officer acknowledged that she appeared to be "a victim of a crime" and encouraged her to continue pursuing justice. [AR at 77–79].

Despite this, HHSC denied her claim based solely on policy and internal assumptions. It never explained why her testimony was disregarded or how its decision accounted for the undisputed facts. That is not evidence-based decision-making, it is administrative indifference. Such action violates both the substantial evidence standard and the prohibition on arbitrary agency conduct.

The agency's failure to engage with or respond to credible, unrefuted testimony shows a disregard for the record. HHSC's denial cannot be sustained where it rests on speculation and policy, rather than facts. The trial court correctly reversed this decision, and this Court should affirm.

**E. Summary: HHSC's decision was unsupported, unreasonable, and contrary to law.**

Taken together, the agency's errors reveal a decision that cannot withstand judicial review. **HHSC bore the burden to produce a preponderance of evidence at the fair hearing level to justify its decision.** It failed to do so. Rather than conduct the investigation required by regulation, HHSC relied on conclusory testimony and internal policy that contradicts binding law. It ignored the undisputed fact that Ms. Craddock never lost her Lone Star Card

No reasonable person reviewing this record could conclude that HHSC's decision was supported by substantial evidence. It was not the result of fact-finding; it was the product of assumption and inflexible internal policy. That policy is not only inconsistent with the record in this case, but with the legal obligations HHSC must follow in administering public benefits.

While these errors alone justify affirmance, the agency's reliance on internal guidance in place of binding law is also a legal error warranting reversal on independent grounds.

**II. HHSC committed legal error by applying internal policy instead of the controlling regulation.**

Even if the Court were to find that substantial evidence supported HHSC's decision (it does not), reversal would still be required because HHSC applied the wrong legal standard. It relied exclusively on an internal handbook policy that cannot override binding regulations, an error of law subject to de novo review. Tex. Gov't Code § 2001.174(2)(D).

When a statute or regulation is unambiguous, an agency's contrary interpretation is entitled to no deference. *Tex. Health & Hum. Servs. Comm'n v. Estate of Burt*, No. 22-0437, 2024 WL 1945484, at 5, 7 (Tex. May 3, 2024). Internal policy manuals, such as the Texas Works Handbook, do not have the force of law and may not be used to narrow or contradict governing law. *Id.*

The only legal authority cited by HHSC throughout its decision-making process was Texas Works Handbook § B-341. That policy is silent on cloned cards, skimming, or system-level errors. It presumes card loss and applies a rigid framework that does not match the facts of this case. In contrast, 1 Tex. Admin. Code § 372.1521 requires HHSC to evaluate all components of the EBT system in determining whether an agency or contractor error occurred.

**III. HHSC's internal policy conflicts with federal law and is therefore preempted.**

Even if HHSC's decision complied with internal state policy, that policy is inconsistent with federal law governing the administration of SNAP benefits. To the extent Texas Works Handbook § B-341 limits restoration of benefits in a manner that violates federal statutes and regulations, it is preempted and cannot justify the agency's denial.

Under the Supremacy Clause of the United States Constitution, federal law is "the supreme Law of the Land," and any conflicting state law or policy is without effect. U.S. Const. art. VI, cl. 2; see also *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992). Conflict preemption occurs when a state policy stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Here, federal statutes and regulations impose specific requirements on state SNAP administrators, including strict liability for unauthorized losses resulting from system errors. See 7 U.S.C. §§ 2016(e), 2020(b); 7 C.F.R. §§ 273.17(a)(1); 277.18(m).

Ms. Craddock never lost her Lone Star Card. The benefits were withdrawn using a cloned card or stolen data. HHSC's own witness admitted that the transaction was approved based solely on matching card data and PIN. Federal law imposes a duty to evaluate whether this constituted a system error. HHSC did not.

28

Instead, it applied a restrictive state policy that excludes these situations entirely. That policy conflicts with federal law and undermines the purpose of the SNAP program: to ensure eligible households can purchase food.

The trial court was correct to reverse the agency's decision, and this Court should affirm – on both state and federal grounds.

While this Court cannot rewrite HHSC policy, it does have the authority to reject agency decisions that rely on internal rules conflicting with federal law. Under the Supremacy Clause, such conflicts are not merely problematic; they are impermissible. HHSC's rigid reliance on Texas Works Handbook § B-341, to the exclusion of federal mandates and regulatory obligations, undermines the SNAP program's core purpose: to ensure food security for eligible households. As fraud targeting public benefit systems evolves, agency policy must evolve with it. The law must be interpreted, and applied, in a way that protects the people it was designed to serve.

## CONCLUSION

There is no substantial evidence supporting the agency's denial. The agency applied the wrong legal standard, and its internal policy, as written and applied, conflicts with binding state and federal rules.

29

For all these reasons, Appellee respectfully asks this Court to affirm the trial court's judgment in full.

## PRAYER

Appellee respectfully requests that this Court affirm the judgment of the 250th Judicial District Court of Travis County, which correctly found that HHSC's decision was not supported by substantial evidence and conflicted with applicable law. Appellee further requests all relief to which she may be justly entitled.

Respectfully Submitted,

**LONE STAR LEGAL AID**

/s/ Elizabeth E. Ewing
Elizabeth E. Ewing, Attorney in Charge
State Bar #24092396
Lone Star Legal Aid
164 6th SE
Paris, TX 75460
Telephone: 903-785-8711
Fax: 903-785-5990
Email: eewing@lonestarlegal.org

David Beyleryan, Co-Counsel
State Bar #24087164
Lone Star Legal Aid

**ATTORNEYS FOR APPELLEE**

**CERTIFICATE OF COMPLIANCE**

I, Elizabeth E. Ewing, attorney for Appellee, certify that this brief is in compliance with the Texas Rules of Appellate Procedure 9.4, and that it has a computer-generated word count of 4,425 words, which is within the limit, excluding any parts exempted by the Rule.

/s/ Elizabeth E. Ewing
Elizabeth E. Ewing
Attorney for Appellee

**CERTIFICATE OF SERVICE**

I certify that I have delivered a true and exact copy of this Appellee's Brief, to Attorney for the Appellant by electronic service at:

JENNIFER COOK – Texas Bar No. 00789233
Assistant Attorney General
General Litigation Division
Office of the Attorney General
jennifer.cook@oag.texas.gov

This the 22nd day of May, 2025

/s/ Elizabeth E. Ewing
Elizabeth E. Ewing
Attorney for Appellee

CASE NO. 15-25-00010-CV

IN THE COURT OF APPEALS
FOR THE FIFTEENTH JUDICIAL DISTRICT
AUSTIN, TEXAS

TEXAS HEALTH AND HUMAN SERVICES COMMISSION,
*Appellant,*

v.

SHANRESSA CRADDOCK
*Appellee.*

**APPELLEE'S BRIEF**

**APPENDIX TO APPELLEE'S BRIEF**

Appendix #1 – Trial Court Order
Appendix #2 – Federal statutes from United States Code
Appendix #3 – Federal regulations from Code of Federal Regulations
Appendix #4 – Sections of Texas Administrative Code
Appendix #5 – Texas Works Handbook § B-341
Appendix #6 – Texas statutes from Texas Government Code

Respectfully Submitted,

**LONE STAR LEGAL AID**

<u>/s/ Elizabeth E. Ewing</u>
Elizabeth E. Ewing, Attorney in Charge
State Bar #24092396
Lone Star Legal Aid
164 6th SE
Paris, TX 75460

Telephone: 903-785-8711
Fax: 903-785-5990
Email: eewing@lonestarlegal.org

David Beyleryan, Co-Counsel
State Bar #24087164
Lone Star Legal Aid

ATTORNEYS FOR APPELLEE

## **CERTIFICATE OF SERVICE**

I certify that I have delivered a true and exact copy of this Appendix to Appellee's Brief, to Attorney for the Appellant by electronic service at:

JENNIFER COOK – Texas Bar No. 00789233
Assistant Attorney General
General Litigation Division
Office of the Attorney General
jennifer.cook@oag.texas.gov

This the 22nd day of May, 2025          /s/ Elizabeth E. Ewing
                                        Elizabeth E. Ewing
                                        Attorney for Appellee

# APPENDIX 1

## Trial Court Order

NO. D-1-GN-22-007315

| | | |
|---|---|---|
| SHANRESSA CRADDOCK | § | IN THE DISTRICT COURT |
| | § | |
| V. | § | |
| | § | 250TH JUDICIAL DISTRICT |
| TEXAS HEALTH AND | § | |
| HUMAN SERVICES COMMISSION | § | TRAVIS COUNTY, TEXAS |

## FINAL ORDER ON ADMINISTRATIVE APPEAL

On November 14, 2024, the Court heard the above-referenced matter. Elizabeth Ewing appeared for Plaintiff, and Mason Currah, Assistant Attorney General, appeared for Defendant.

*Relief Granted*

After careful consideration of the administrative record, the parties' briefs, the applicable law, and argument of counsel, the Court concludes that substantial evidence does not support Defendant's decision to deny replacement SNAP benefits to Plaintiff under the facts of this case; and that Defendant's decision to deny replacement benefits to Plaintiff is contrary to law. *See* Decision Letter dated October 13, 2022.

The Court further concludes that Defendant's policy in Texas Works Handbook § B-341 is outdated, unworkable, and in conflict with law. *See* 7 U.S.C. § 2020(e)(11); 7 C.F.R. § 273.17(a)(1); 7 U.S.C. § 2016(e); 7 C.F.R. § 276.2(b)(7); 7 C.F.R. § 277.18(m)(1); and 1 Tex. Admin. Code § 372.1519); *Skipper v. Duffy*, 703 F. Supp. 697 (ND Ill 1988). Defendant's decision is accordingly, REVERSED.

Defendant is ORDERED to restore Plaintiff's SNAP benefits in the amount of $930.00.

Costs are taxed against Defendant.

**IT IS SO ORDERED**.

SIGNED in Chambers on December 31, 2024.

_____

MADELEINE CONNOR, JUDGE PRESIDING

# APPENDIX 2

## Federal statutes from
## United States Code

United States Code Annotated
  Title 7. Agriculture (Refs & Annos)
    Chapter 51. Supplemental Nutrition Assistance Program (Refs & Annos)

7 U.S.C.A. § 2016

§ 2016. Issuance and use of program benefits

Effective: December 20, 2018
Currentness

**(a) In general**

Except as provided in subsection (i), EBT cards shall be issued only to households which have been duly certified as eligible to participate in the supplemental nutrition assistance program.

**(b) Use**

Benefits issued to eligible households shall be used by them only to purchase food from retail food stores which have been approved for participation in the supplemental nutrition assistance program at prices prevailing in such stores: *Provided*, That nothing in this chapter shall be construed as authorizing the Secretary to specify the prices at which food may be sold by wholesale food concerns or retail food stores.

**(c) Design**

**(1) In general**

EBT cards issued to eligible households shall be simple in design and shall include only such words or illustrations as are required to explain their purpose.

**(2) Prohibition**

The name of any public official shall not appear on any EBT card.

**(d) Delivery and control procedures**

The Secretary shall prescribe appropriate procedures for the delivery of benefits to benefit issuers and for the subsequent controls to be placed over such benefits by benefit issuers in order to ensure adequate accountability.

**(e) State issuance liability**

Notwithstanding any other provision of this chapter, the State agency shall be strictly liable to the Secretary for any financial losses involved in the acceptance, storage and issuance of benefits, except that in the case of losses resulting from the issuance

and replacement of authorizations for benefits which are sent through the mail, the State agency shall be liable to the Secretary to the extent prescribed in the regulations promulgated by the Secretary.

**(f) Alternative benefit delivery**

**(1) In general**

If the Secretary determines, in consultation with the Inspector General of the Department of Agriculture, that it would improve the integrity of the supplemental nutrition assistance program, the Secretary shall require a State agency to issue or deliver benefits using alternative methods.

**(2) Imposition of costs**

**(A) In general**

Except as provided in subparagraph (B), the Secretary shall require participating retail food stores (including restaurants participating in a State option restaurant program intended to serve the elderly, disabled, and homeless) to pay 100 percent of the costs of acquiring, and arrange for the implementation of, electronic benefit transfer point-of-sale equipment and supplies, including related services.

**(B) Exemptions**

The Secretary may exempt from subparagraph (A)--

**(i)** farmers' markets and other direct-to-consumer markets, military commissaries, nonprofit food buying cooperatives, and establishments, organizations, programs, or group living arrangements described in paragraphs (5), (7), and (8) of section 2012(k) of this title; and

**(ii)** establishments described in paragraphs (3), (4), and (9) of section 2012(k) of this title, other than restaurants participating in a State option restaurant program.

**(C) Interchange fees**

Nothing in this paragraph permits the charging of fees relating to the redemption of supplemental nutrition assistance program benefits, in accordance with subsection (h)(13).

**(3) Devaluation and termination of issuance of paper coupons**

**(A) Coupon issuance**

Effective on the date of enactment of the Food, Conservation, and Energy Act of 2008, no State shall issue any coupon, stamp, certificate, or authorization card to a household that receives supplemental nutrition assistance under this chapter.

**(B) EBT cards**

Effective beginning on the date that is 1 year after the date of enactment of the Food, Conservation, and Energy Act of 2008, only an EBT card issued under subsection (i) shall be eligible for exchange at any retail food store.

**(C) De-obligation of coupons**

Coupons not redeemed during the 1-year period beginning on the date of enactment of the Food, Conservation, and Energy Act of 2008 shall--

**(i)** no longer be an obligation of the Federal Government; and

**(ii)** not be redeemable.

**(4) Termination of manual vouchers**

**(A) In general**

Effective beginning on February 7, 2014, except as provided in subparagraph (B), no State shall issue manual vouchers to a household that receives supplemental nutrition assistance under this chapter or allow retail food stores to accept manual vouchers as payment, unless the Secretary determines that the manual vouchers are necessary, such as in the event of an electronic benefit transfer system failure or a disaster situation.

**(B) Exemptions**

The Secretary may exempt categories of retail food stores or individual retail food stores from subparagraph (A) based on criteria established by the Secretary.

**(5) Unique identification number required**

**(A) In general**

To enhance the anti-fraud protections of the program, the Secretary shall require all parties providing electronic benefit transfer services to provide for and maintain unique terminal identification number information through the supplemental nutrition assistance program electronic benefit transfer transaction routing system.

**(B) Regulations**

**(i) In general**

Not earlier than 2 years after February 7, 2014, the Secretary shall issue proposed regulations to carry out this paragraph.

### (ii) Commercial practices

In issuing regulations to carry out this paragraph, the Secretary shall consider existing commercial practices for other point-of-sale debit transactions.

### (C) Operation of individual point of sale device by farmers' markets and direct marketing farmers

A farmers' market or direct marketing farmer that is exempt under paragraph (2)(B)(i) shall be allowed to operate an individual electronic benefit transfer point of sale device at more than 1 location under the same supplemental nutrition assistance program authorization, if--

**(i)** the farmers' market or direct marketing farmer provides to the Secretary information on location and hours of operation at each location; and

**(ii)(I)** the point of sale device used by the farmers' market or direct marketing farmer is capable of providing location information of the device through the electronic benefit transfer system; or

**(II)** if the Secretary determines that the technology is not available for a point of sale device to meet the requirement under subclause (I), the farmers' market or direct marketing farmer provides to the Secretary any other information, as determined by the Secretary, necessary to ensure the integrity of transactions processed using the point of sale device.

## (g) Staggered issuance procedures

**(1)** The State agency may establish a procedure for staggering the issuance of benefits to eligible households throughout the month. Upon the request of the tribal organization that exercises governmental jurisdiction over the reservation, the State agency shall stagger the issuance of benefits for eligible households located on reservations for at least 15 days of a month.

### (2) Requirements

#### (A) In general

Any procedure established under paragraph (1) shall--

**(i)** not reduce the allotment of any household for any period; and

**(ii)** ensure that no household experiences an interval between issuances of more than 40 days.

#### (B) Multiple issuances

The procedure may include issuing benefits to a household in more than 1 issuance during a month only when a benefit correction is necessary.

**(h) Electronic benefit transfers**

**(1) In general**

**(A) Implementation**

Not later than October 1, 2002, each State agency shall implement an electronic benefit transfer system under which household benefits determined under section 2017(a) or 2035 of this title are issued from and stored in a central databank, unless the Secretary provides a waiver for a State agency that faces unusual barriers to implementing an electronic benefit transfer system.

**(B) Timely implementation**

Each State agency is encouraged to implement an electronic benefit transfer system under subparagraph (A) as soon as practicable.

**(C) State flexibility**

Subject to paragraph (2), a State agency may procure and implement an electronic benefit transfer system under the terms, conditions, and design that the State agency considers appropriate.

**(D) Operation**

An electronic benefit transfer system should take into account generally accepted standard operating rules based on--

**(i)** commercial electronic funds transfer technology;

**(ii)** the need to permit interstate operation and law enforcement monitoring; and

**(iii)** the need to permit monitoring and investigations by authorized law enforcement agencies.

**(2)** The Secretary shall issue final regulations that establish standards for the approval of such a system and shall periodically review such regulations and modify such regulations to take into account evolving technology and comparable industry standards. The standards shall include--

**(A)** defining the required level of recipient protection regarding privacy, ease of use, and access to and service in retail food stores;

**(B)** the terms and conditions of participation by retail food stores, financial institutions, and other appropriate parties;

**(C)(i)** measures to maximize the security of a system using the most recent technology available that the State agency considers appropriate and cost effective and which may include personal identification numbers, photographic identification on electronic benefit transfer cards, and other measures to protect against fraud and abuse; and

**(ii)** unless determined by the Secretary to be located in an area with significantly limited access to food, measures that require an electronic benefit transfer system--

**(I)** to set and enforce sales restrictions based on benefit transfer payment eligibility by using scanning or product lookup entry; and

**(II)** to deny benefit tenders for manually entered sales of ineligible items.

**(D)** system transaction interchange, reliability, and processing speeds;

**(E)** financial accountability;

**(F)** the required testing of system operations prior to implementation;

**(G)** the analysis of the results of system implementation in a limited project area prior to expansion; and

**(H)** procurement standards.

**(3)** In the case of a system described in paragraph (1) in which participation is not optional for households, the Secretary shall not approve such a system unless--

**(A)** a sufficient number of eligible retail food stores, including those stores able to serve minority language populations, have agreed to participate in the system throughout the area in which it will operate to ensure that eligible households will not suffer a significant reduction in their choice of retail food stores or a significant increase in the cost of food or transportation to participating food stores; and

**(B)** any special equipment necessary to allow households to purchase food with the benefits issued under this chapter is operational at a sufficient number of registers to provide service that is comparable to service provided individuals who are not members of households receiving supplemental nutrition assistance program benefits, as determined by the Secretary.

**(4)** Administrative costs incurred in connection with activities under this subsection shall be eligible for reimbursement in accordance with section 2025 of this title, subject to the limitations in section 2025(g) of this title.

**(5)** The Secretary shall periodically inform State agencies of the advantages of using electronic benefit systems to issue benefits in accordance with this subsection in lieu of issuing coupons to households.

**(6)** This subsection shall not diminish the authority of the Secretary to conduct projects to test automated or electronic benefit delivery systems under section 2026(f) of this title.

**(7) Replacement of benefits**

Regulations issued by the Secretary regarding the replacement of benefits and liability for replacement of benefits under an electronic benefit transfer system shall be similar to the regulations in effect for a paper-based supplemental nutrition assistance issuance system.

**(8) Replacement of cards**

**(A) Fees**

A State agency may collect a charge for replacement of an electronic benefit transfer card by reducing the monthly allotment of the household receiving the replacement card.

**(B) Purposeful loss of cards**

**(i) In general**

Subject to terms and conditions established by the Secretary in accordance with clause (ii), if a household makes excessive requests for replacement of the electronic benefit transfer card of the household, the Secretary may require a State agency to decline to issue a replacement card to the household unless the household, upon request of the State agency, provides an explanation for the loss of the card.

**(ii) Requirements**

The terms and conditions established by the Secretary shall provide that--

**(I)** the household be given the opportunity to provide the requested explanation and meet the requirements under this paragraph promptly;

**(II)** after an excessive number of lost cards, the head of the household shall be required to review program rights and responsibilities with State agency personnel authorized to make determinations under section 2014(a) of this title; and

**(III)** any action taken, including actions required under section 2015(b)(2) of this title, other than the withholding of the electronic benefit transfer card until an explanation described in subclause (I) is provided, shall be consistent with the due process protections under section 2015(b) or 2020(e)(10) of this title, as appropriate.

### (C) Protecting vulnerable persons

In implementing this paragraph, a State agency shall act to protect homeless persons, persons with disabilities, victims of crimes, and other vulnerable persons who lose electronic benefit transfer cards but are not intentionally committing fraud.

### (D) Effect on eligibility

While a State may decline to issue an electronic benefits transfer card until a household satisfies the requirements under this paragraph, nothing in this paragraph shall be considered a denial of, or limitation on, the eligibility for benefits under section 2014 of this title.

## (9) Optional photographic identification

### (A) In general

A State agency may require that an electronic benefit card contain a photograph of 1 or more members of a household.

### (B) Other authorized users

If a State agency requires a photograph on an electronic benefit card under subparagraph (A), the State agency shall establish procedures to ensure that any other appropriate member of the household or any authorized representative of the household may utilize the card.

### (10) Federal law not applicable

Section 1693*o*-2 of Title 15 shall not apply to electronic benefit transfer or reimbursement systems under this chapter.

## (11) Application of anti-tying restrictions to electronic benefit transfer systems

### (A) Definitions

In this paragraph:

#### (i) Affiliate

The term "affiliate" has the meaning provided the term in section 1841(k) of Title 12.

#### (ii) Company

The term "company" has the meaning provided the term in section 1971 of Title 12, but shall not include a bank, a bank holding company, or any subsidiary of a bank holding company.

**(iii) Electronic benefit transfer service**

The term "electronic benefit transfer service" means the processing of electronic transfers of household benefits, determined under section 2017(a) or 2035 of this title, if the benefits are--

**(I)** issued from and stored in a central databank;

**(II)** electronically accessed by household members at the point of sale; and

**(III)** provided by a Federal or State government.

**(iv) Point-of-sale service**

The term "point-of-sale service" means any product or service related to the electronic authorization and processing of payments for merchandise at a retail food store, including credit or debit card services, automated teller machines, point-of-sale terminals, or access to on-line systems.

**(B) Restrictions**

A company may not sell or provide electronic benefit transfer services, or fix or vary the consideration for electronic benefit transfer services, on the condition or requirement that the customer--

**(i)** obtain some additional point-of-sale service from the company or an affiliate of the company; or

**(ii)** not obtain some additional point-of-sale service from a competitor of the company or competitor of any affiliate of the company.

**(C) Consultation with the federal reserve board**

Before promulgating regulations or interpretations of regulations to carry out this paragraph, the Secretary shall consult with the Board of Governors of the Federal Reserve System.

**(12) Recovering electronic benefits**

**(A) In general**

A State agency shall establish a procedure for recovering electronic benefits from the account of a household due to inactivity, or due to the death of all members of the household.

**(B) Benefit storage**

#### (i) In general

A State agency may store recovered electronic benefits off-line in accordance with clause (ii), if the household has not accessed the account after 3 months.

#### (ii) Notice of benefit storage

A State agency shall--

##### (I) send notice to a household the benefits of which are stored under clause (i); and

##### (II) not later than 48 hours after request by the household, make the stored benefits available to the household.

### (C) Benefit expunging

#### (i) In general

Subject to clause (ii), a State agency shall expunge benefits that have not been accessed by a household after a period of 9 months, or upon verification that all members of the household are deceased.

#### (ii) Notice of benefit expunging

Not later than 30 days before benefits are to be expunged under clause (i), a State agency shall--

##### (I) provide sufficient notice to the household that benefits will be expunged due to inactivity, and the date upon which benefits will be expunged;

##### (II) for benefits stored off-line in accordance with subparagraph (B), provide the household an opportunity to request that such benefits be restored to the household; and

##### (III) not later than 48 hours after request by the household, make the benefits available to the household.

### (D) Notice

A State agency shall--

#### (i) send notice to a household the benefits of which are stored under subparagraph (B); and

#### (ii) not later than 48 hours after request by the household, make the stored benefits available to the household.

**(13) Fees**

**(A) Interchange fees**

No interchange fees shall apply to electronic benefit transfer transactions under this subsection.

**(B) Other fees**

Effective through fiscal year 2023, neither a State, nor any agent, contractor, or subcontractor of a State who facilitates the provision of supplemental nutrition assistance program benefits in such State may impose a fee for switching (as defined in subsection (j)(1)(H)) or routing such benefits.

**(14) Mobile technologies**

**(A) In general**

Subject to subparagraph (B), the Secretary shall authorize the use of mobile technologies for the purpose of accessing supplemental nutrition assistance program benefits.

**(B) Demonstration projects on access of benefits through mobile technologies**

**(i) Demonstration projects**

Before authorizing implementation of subparagraph (A) in all States, the Secretary shall approve not more than 5 demonstration project proposals submitted by State agencies that will pilot the use of mobile technologies for supplemental nutrition assistance program benefits access.

**(ii) Project requirements**

To be eligible to participate in a demonstration project under clause (i), a State agency shall submit to the Secretary for approval a plan that--

**(I)** provides recipient protections regarding privacy, ease of use, household access to benefits, and support similar to the protections provided under existing methods;

**(II)** ensures that all recipients, including those without access to mobile payment technology and those who shop across State borders, have a means of benefit access;

**(III)** requires retail food stores, unless exempt under section 2016(f)(2)(B) of this title, to bear the costs of acquiring and arranging for the implementation of point-of-sale equipment and supplies for the redemption of benefits that are accessed through mobile technologies;

**(IV)** requires that foods purchased with benefits issued under this section through mobile technologies are purchased at a price not higher than the price of the same food purchased by other methods used by the retail food store, as determined by the Secretary;

**(V)** ensures adequate documentation for each authorized transaction, adequate security measures to deter fraud, and adequate access to retail food stores that accept benefits accessed through mobile technologies, as determined by the Secretary;

**(VI)** provides for an evaluation of the demonstration project, including, but not limited to, an evaluation of household access to benefits;

**(VII)** requires that the State demonstration projects are voluntary for all retail food stores and that all recipients are able to use benefits in non-participating retail food stores; and

**(VIII)** meets other criteria as established by the Secretary.

**(iii) Priority**

The Secretary may prioritize demonstration project proposals that would--

**(I)** reduce fraud;

**(II)** encourage positive nutritional outcomes; and

**(III)** meet such other criteria as determined by the Secretary.

**(iv) Date of project approval**

The Secretary shall solicit and approve the qualifying demonstration projects required under subparagraph (B)(i) not later than January 1, 2021.

**(C) Report to Congress**

The Secretary shall--

**(i)** by not later than January 1, 2022, authorize implementation of subparagraph (A) in all States, unless the Secretary makes a finding, based on the data provided under subparagraph (B), that implementation in all States requires further study by way of an extended pilot period or is not in the best interest of the supplemental nutrition assistance program; and

**(ii)** if the determination made in clause (i) is not to implement subparagraph (A) in all States, submit a report to the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate that includes the basis of the finding.

**(i) State option to issue benefits to certain individuals made ineligible by welfare reform**

**(1) In general**

Notwithstanding any other provision of law, a State agency may, with the approval of the Secretary, issue benefits under this chapter to an individual who is ineligible to participate in the supplemental nutrition assistance program solely as a result of section 2015(o)(2) of this title or section 1612 or 1613 of Title 8.

**(2) State payments to Secretary**

**(A) In general**

Not later than the date the State agency issues benefits to individuals under this subsection, the State agency shall pay the Secretary, in accordance with procedures established by the Secretary, an amount that is equal to--

**(i)** the value of the benefits; and

**(ii)** the costs of issuing and redeeming benefits, and other Federal costs, incurred in providing the benefits, as determined by the Secretary.

**(B) Crediting**

Notwithstanding section 3302(b) of Title 31, payments received under subparagraph (A) shall be credited to the supplemental nutrition assistance program appropriation account or the account from which the costs were drawn, as appropriate, for the fiscal year in which the payment is received.

**(3) Reporting**

To be eligible to issue benefits under this subsection, a State agency shall comply with reporting requirements established by the Secretary to carry out this subsection.

**(4) Plan**

To be eligible to issue benefits under this subsection, a State agency shall--

**(A)** submit a plan to the Secretary that describes the conditions and procedures under which the benefits will be issued, including eligibility standards, benefit levels, and the methodology the State agency will use to determine amounts due the Secretary under paragraph (2); and

**(B)** obtain the approval of the Secretary for the plan.

**(5) Violations**

A sanction, disqualification, fine, or other penalty prescribed under Federal law (including sections 2021 and 2024 of this title) shall apply to a violation committed in connection with a benefit issued under this subsection.

**(6) Ineligibility for administrative reimbursement**

Administrative and other costs incurred in issuing a benefit under this subsection shall not be eligible for Federal funding under this chapter.

**(7) Exclusion from enhanced payment accuracy systems**

Section 2025(c) of this title shall not apply to benefits issued under this subsection.

**(j) Interoperability and portability of electronic benefit transfer transactions**

**(1) Definitions**

In this subsection:

**(A) Electronic benefit transfer card**

The term "electronic benefit transfer card" means a card that provides benefits under this chapter through an electronic benefit transfer service (as defined in subsection (h)(11)(A)).

**(B) Electronic benefit transfer contract**

The term "electronic benefit transfer contract" means a contract that provides for the issuance, use, or redemption of program benefits in the form of electronic benefit transfer cards.

**(C) Interoperability**

The term "interoperability" means a system that enables program benefits in the form of an electronic benefit transfer card to be redeemed in any State.

**(D) Interstate transaction**

The term "interstate transaction" means a transaction that is initiated in 1 State by the use of an electronic benefit transfer card that is issued in another State.

**(E) Portability**

The term "portability" means a system that enables program benefits in the form of an electronic benefit transfer card to be used in any State by a household to purchase food at a retail food store or wholesale food concern approved under this chapter.

**(F) Settling**

The term "settling" means movement, and reporting such movement, of funds from an electronic benefit transfer card issuer that is located in 1 State to a retail food store, or wholesale food concern, that is located in another State, to accomplish an interstate transaction.

**(G) Smart card**

The term "smart card" means an intelligent benefit card described in section 2026(f) of this title.

**(H) Switching**

The term "switching" means the routing of an intrastate or interstate transaction that consists of transmitting the details of a transaction electronically recorded through the use of an electronic benefit transfer card in one State to the issuer of the card that may be in the same or different State.

**(2) Requirement**

Not later than October 1, 2002, the Secretary shall ensure that systems that provide for the electronic issuance, use, and redemption of program benefits in the form of electronic benefit transfer cards are interoperable, and supplemental nutrition assistance program benefits are portable, among all States.

**(3) Cost**

The cost of achieving the interoperability and portability required under paragraph (2) shall not be imposed on any retail store, or any wholesale food concern, approved to participate in the supplemental nutrition assistance program.

**(4) Standards**

Not later than 210 days after February 11, 2000, the Secretary shall promulgate regulations that--

**(A)** adopt a uniform national standard of interoperability and portability required under paragraph (2) that is based on the standard of interoperability and portability used by a majority of State agencies; and

**(B)** require that any electronic benefit transfer contract that is entered into 30 days or more after the regulations are promulgated, by or on behalf of a State agency, provide for the interoperability and portability required under paragraph (2) in accordance with the national standard.

**(5) Exemptions**

**(A) Contracts**

The requirements of paragraph (2) shall not apply to the transfer of benefits under an electronic benefit transfer contract before the expiration of the term of the contract if the contract--

**(i)** is entered into before the date that is 30 days after the regulations are promulgated under paragraph (4); and

**(ii)** expires after October 1, 2002.

**(B) Waiver**

At the request of a State agency, the Secretary may provide 1 waiver to temporarily exempt, for a period ending on or before the date specified under clause (iii), the State agency from complying with the requirements of paragraph (2), if the State agency--

**(i)** establishes to the satisfaction of the Secretary that the State agency faces unusual technological barriers to achieving by October 1, 2002, the interoperability and portability required under paragraph (2);

**(ii)** demonstrates that the best interest of the supplemental nutrition assistance program would be served by granting the waiver with respect to the electronic benefit transfer system used by the State agency to administer the supplemental nutrition assistance program; and

**(iii)** specifies a date by which the State agency will achieve the interoperability and portability required under paragraph (2).

**(C) Smart card systems**

The Secretary shall allow a State agency that is using smart cards for the delivery of supplemental nutrition assistance program benefits to comply with the requirements of paragraph (2) at such time after October 1, 2002, as the Secretary determines that a practicable technological method is available for interoperability with electronic benefit transfer cards.

**(6) Funding**

**(A) In general**

In accordance with regulations promulgated by the Secretary, the Secretary shall pay 100 percent of the costs incurred by a State agency under this chapter for switching and settling interstate transactions--

**(i)** incurred after February 11, 2000, and before October 1, 2002, if the State agency uses the standard of interoperability and portability adopted by a majority of State agencies; and

**(ii)** incurred after September 30, 2002, if the State agency uses the uniform national standard of interoperability and portability adopted under paragraph (4)(A).

**(B) Limitation**

The total amount paid to State agencies for each fiscal year under subparagraph (A) shall not exceed $500,000.

**(k) Acceptance of program benefits through online transactions**

**(1) In general**

Subject to paragraph (4), the Secretary shall approve retail food stores to accept benefits from recipients of supplemental nutrition assistance through on-line transactions.

**(2) Requirements to accept benefits**

A retail food store seeking to accept benefits from recipients of supplemental nutrition assistance through on-line transactions shall--

**(A)** establish recipient protections regarding privacy, ease of use, access, and support similar to the protections provided for transactions made in retail food stores;

**(B)** ensure benefits are not used to pay delivery, ordering, convenience, or other fees or charges;

**(C)** clearly notify participating households at the time a food order is placed--

**(i)** of any delivery, ordering, convenience, or other fee or charge associated with the food purchase; and

**(ii)** that any such fee cannot be paid with benefits provided under this chapter;

**(D)** ensure the security of on-line transactions by using the most effective technology available that the Secretary considers appropriate and cost-effective and that is comparable to the security of transactions at retail food stores; and

**(E)** meet other criteria as established by the Secretary.

**(3) State agency action**

Each State agency shall ensure that recipients of supplemental nutrition assistance can use benefits on-line as described in this subsection as appropriate.

**(4) Demonstration project on acceptance of benefits through on-line transactions**

**(A) In general**

Before the Secretary authorizes implementation of paragraph (1) in all States, the Secretary shall carry out a number of demonstration projects as determined by the Secretary to test the feasibility of allowing retail food stores to accept benefits through on-line transactions.

**(B) Demonstration projects**

To be eligible to participate in a demonstration project under subparagraph (A), a retail food store shall submit to the Secretary for approval a plan that includes--

**(i)** a method of ensuring that benefits may be used to purchase only eligible items under this chapter;

**(ii)** a description of the method of educating participant households about the availability and operation of on-line purchasing;

**(iii)** adequate testing of the on-line purchasing option prior to implementation;

**(iv)** the provision of data as requested by the Secretary for purposes of analyzing the impact of the project on participant access, ease of use, and program integrity;

**(v)** reports on progress, challenges, and results, as determined by the Secretary; and

**(vi)** such other criteria, including security criteria, as established by the Secretary.

**CREDIT(S)**

(Pub.L. 88-525, § 7, Aug. 31, 1964, 78 Stat. 705; Pub.L. 91-671, § 5, Jan. 11, 1971, 84 Stat. 2050; Pub.L. 93-86, § 3(m), Aug. 10, 1973, 87 Stat. 248; Pub.L. 93-125, § 1(k), Oct. 18, 1973, 87 Stat. 450; Pub.L. 94-339, § 2, July 5, 1976, 90 Stat. 799; Pub.L. 95-113, Title XIII, § 1301, Sept. 29, 1977, 91 Stat. 967; Pub.L. 97-98, Title XIII, § 1312, Dec. 22, 1981, 95 Stat. 1285; Pub.L. 97-253, Title I, §§ 162, 190(c)(2), Sept. 8, 1982, 96 Stat. 778, 787; Pub.L. 99-198, Title XV, §§ 1518, 1519, Dec. 23, 1985, 99 Stat. 1578; Pub.L. 100-435, Title II, § 203(b), Sept. 19, 1988, 102 Stat. 1657; Pub.L. 101-624, Title XVII, §§ 1728, 1729(a), Nov. 28, 1990, 104 Stat. 3788, 3789; Pub.L. 103-225, Title I, § 102, Mar. 25, 1994, 108 Stat. 107; Pub.L. 104-193, Title VIII, § 825(a), Aug. 22, 1996, 110 Stat. 2324; Pub.L. 105-18, Title VII, [(a)], June 12, 1997, 111 Stat. 216; Pub.L. 106-171, § 3, Feb. 11, 2000, 114 Stat. 3; Pub.L. 107-171, Title IV, § 4110, May 13, 2002, 116 Stat. 309; Pub.L. 110-234, Title IV, §§ 4001(b), 4002(a)(4), 4113 to 4115(a), May 22, 2008, 122 Stat. 1092, 1093, 1103; Pub.L. 110-246, § 4(a), Title IV, §§ 4001(b), 4002(a) (4), 4113 to 4115(a), June 18, 2008, 122 Stat. 1664, 1853, 1854, 1864, 1865; Pub.L. 111-203, Title X, § 1075(b), July 21, 2010, 124 Stat. 2074; Pub.L. 113-79, Title IV, §§ 4002(b) to (d), 4010 to 4011(b)(2)(A), 4030(e), Feb. 7, 2014, 128 Stat. 783, 789 to 793, 814; Pub.L. 115-334, Title IV, §§ 4001(b), 4006(a) to (e), Dec. 20, 2018, 132 Stat. 4624, 4634.)

Notes of Decisions (11)

7 U.S.C.A. § 2016, 7 USCA § 2016
Current through P.L. 118-22. Some statute sections may be more current, see credits for details.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 7. Agriculture (Refs & Annos)
        Chapter 51. Supplemental Nutrition Assistance Program (Refs & Annos)

7 U.S.C.A. § 2020

§ 2020. Administration

Effective: December 27, 2022
Currentness

**(a) State responsibility**

**(1) In general**

The State agency of each participating State shall have responsibility for certifying applicant households and issuing EBT cards.

**(2) Local administration**

The responsibility of the agency of the State government shall not be affected by whether the program is operated on a State-administered or county-administered basis, as provided under section 2012(s)(1) of this title.

**(3) Records**

**(A) In general**

Each State agency shall keep such records as may be necessary to determine whether the program is being conducted in compliance with this chapter (including regulations issued under this chapter).

**(B) Inspection and audit**

All records, and the entire information systems in which records are contained, that are covered in subparagraph (A) shall--

**(i)** be made available for inspection and audit by the Secretary, subject to data and security protocols agreed to by the State agency and Secretary;

**(ii)** subject to subsection (e)(8), be available for review in any action filed by a household to enforce any provision of this chapter (including regulations issued under this chapter); and

**(iii)** be preserved for such period of not less than 3 years as may be specified in regulations.

### (4) Review of major changes in program design

#### (A) In general

The Secretary shall develop standards for identifying major changes in the operations of a State agency, including--

(i) large or substantially-increased numbers of low-income households that do not live in reasonable proximity to an office performing the major functions described in subsection (e);

(ii) substantial increases in reliance on automated systems for the performance of responsibilities previously performed by personnel described in subsection (e)(6)(B);

(iii) changes that potentially increase the difficulty of reporting information under subsection (e) or section 2015(c) of this title; and

(iv) changes that may disproportionately increase the burdens on any of the types of households described in subsection (e)(2)(A).

#### (B) Notification

If a State agency implements a major change in operations, the State agency shall--

(i) notify the Secretary; and

(ii) collect such information as the Secretary shall require to identify and correct any adverse effects on program integrity or access, including access by any of the types of households described in subsection (e)(2)(A).

### (b) Correction of improper denials and under-issuances

When a State agency learns, through its own reviews under section 2025 of this title or other reviews, or through other sources, that it has improperly denied, terminated, or underissued benefits to an eligible household, the State agency shall promptly restore any improperly denied benefits to the extent required by subsection (e)(11) and section 2023(b) of this title, and shall take other steps to prevent a recurrence of such errors where such error was caused by the application of State agency practices, rules or procedures inconsistent with the requirements of this chapter or with regulations or policies of the Secretary issued under the authority of this chapter.

### (c) Civil rights compliance

#### (1) In general

In the certification of applicant households for the supplemental nutrition assistance program, there shall be no discrimination by reason of race, sex, religious creed, national origin, or political affiliation.

**(2) Relation to other laws**

The administration of the program by a State agency shall be consistent with the rights of households under the following laws (including implementing regulations):

**(A)** The Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.).

**(B)** Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794).

**(C)** The Americans with Disabilities Act of 1990 (42 U.S.C. 12101 et seq.).

**(D)** Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.).

**(d) Plan of operation by State agency; approval by Secretary; Indians**

The State agency (as defined in section 2012(s)(1) of this title) of each State desiring to participate in the supplemental nutrition assistance program shall submit for approval a plan of operation specifying the manner in which such program will be conducted within the State in every political subdivision. The Secretary may not, as a part of the approval process for a plan of operation, require a State to submit for prior approval by the Secretary the State agency instructions to staff, interpretations of existing policy, State agency methods of administration, forms used by the State agency, or any materials, documents, memoranda, bulletins, or other matter, unless the State determines that the materials, documents, memoranda, bulletins, or other matter alter or amend the State plan of operation or conflict with the rights and levels of benefits to which a household is entitled. In the case of all or part of an Indian reservation, the State agency as defined in section 2012(s)(1) of this title shall be responsible for conducting such program on such reservation unless the Secretary determines that the State agency (as defined in section 2012(s)(1) of this title) is failing, subsequent to August 31, 1964, properly to administer such program on such reservation in accordance with the purposes of this chapter and further determines that the State agency as defined in section 2012(s)(2) of this title is capable of effectively and efficiently conducting such program, in light of the distance of the reservation from State agency-operated certification and issuance centers, the previous experience of such tribal organization in the operation of programs authorized under the Indian Self-Determination Act (25 U.S.C. 450) and similar Acts of Congress, the tribal organization's management and fiscal capabilities, and the adequacy of measures taken by the tribal organization to ensure that there shall be no discrimination in the operation of the program on the basis of race, color, sex, or national origin, in which event such State agency shall be responsible for conducting such program and submitting for approval a plan of operation specifying the manner in which such program will be conducted. The Secretary, upon the request of a tribal organization, shall provide the designees of such organization with appropriate training and technical assistance to enable them to qualify as expeditiously as possible as a State agency pursuant to section 2012(s)(2) of this title. A State agency, as defined in section 2012(s)(1) of this title, before it submits its plan of operation to the Secretary for the administration of the supplemental nutrition assistance program on all or part of an Indian reservation, shall consult in good faith with the tribal organization about that portion of the State's plan of operation pertaining to the implementation of the program for members of the tribe, and shall implement the program in a manner that is responsive to the needs of the Indians on the reservation as determined by ongoing consultation with the tribal organization.

**(e) Requisites of State plan of operation**

The State plan of operation required under subsection (d) of this section shall provide, among such other provisions as may be required by regulation--

**(1) that the State agency shall--**

(A) at the option of the State agency, inform low-income households about the availability, eligibility requirements, application procedures, and benefits of the supplemental nutrition assistance program; and

(B) comply with regulations of the Secretary requiring the use of appropriate bilingual personnel and printed material in the administration of the program in those portions of political subdivisions in the State in which a substantial number of members of low-income households speak a language other than English;

**(2)(A)** that the State agency shall establish procedures governing the operation of supplemental nutrition assistance program offices that the State agency determines best serve households in the State, including households with special needs, such as households with elderly or disabled members, households in rural areas with low-income members, homeless individuals, households residing on reservations, and households in areas in which a substantial number of members of low-income households speak a language other than English.

**(B)** In carrying out subparagraph (A), a State agency--

(i) shall provide timely, accurate, and fair service to applicants for, and participants in, the supplemental nutrition assistance program;

(ii)(I) shall develop an application containing the information necessary to comply with this chapter; and

(II) if the State agency maintains a website for the State agency, shall make the application available on the website in each language in which the State agency makes a printed application available;

(iii) shall permit an applicant household to apply to participate in the program on the same day that the household first contacts a supplemental nutrition assistance program office in person during office hours;

(iv) shall consider an application that contains the name, address, and signature of the applicant to be filed on the date the applicant submits the application;

(v) shall require that an adult representative of each applicant household certify in writing, under penalty of perjury, that--

(I) the information contained in the application is true; and

**(II)** all members of the household are citizens or are aliens eligible to receive supplemental nutrition assistance program benefits under section 2015(f) of this title;

**(vi)** shall provide a method of certifying and issuing benefits to eligible homeless individuals, to ensure that participation in the supplemental nutrition assistance program is limited to eligible households; and

**(vii)** may establish operating procedures that vary for local supplemental nutrition assistance program offices to reflect regional and local differences within the State.

**(C) Electronic and automated systems**

**(i) In general**

Nothing in this chapter shall prohibit the use of signatures provided and maintained electronically, storage of records using automated retrieval systems only, or any other feature of a State agency's application system that does not rely exclusively on the collection and retention of paper applications or other records.

**(ii) State option for telephonic signature**

A State agency may establish a system by which an applicant household may sign an application through a recorded verbal assent over the telephone.

**(iii) Requirements**

A system established under clause (ii) shall--

**(I)** record for future reference the verbal assent of the household member and the information to which assent was given;

**(II)** include effective safeguards against impersonation, identity theft, and invasions of privacy;

**(III)** not deny or interfere with the right of the household to apply in writing;

**(IV)** promptly provide to the household member a written copy of the completed application, with instructions for a simple procedure for correcting any errors or omissions;

**(V)** comply with paragraph (1)(B);

**(VI)** satisfy all requirements for a signature on an application under this chapter and other laws applicable to the supplemental nutrition assistance program, with the date on which the household member provides verbal assent considered as the date of application for all purposes; and

**(VII)** comply with such other standards as the Secretary may establish.

**(D)** The signature of any adult under this paragraph shall be considered sufficient to comply with any provision of Federal law requiring a household member to sign an application or statement;

**(3)** that the State agency shall thereafter promptly determine the eligibility of each applicant household by way of verification of income other than that determined to be excluded by section 2014(d) of this title (in part through the use of the information, if any, obtained under section 2025(e) of this title and after compliance with the requirement specified in paragraph (24)), household size (in any case such size is questionable), and such other eligibility factors as the Secretary determines to be necessary to implement sections 2014 and 2015 of this title, although the State agency may verify prior to certification, whether questionable or not, the size of any applicant household and such other eligibility factors as the State agency determines are necessary, so as to complete certification of and provide an allotment retroactive to the period of application to any eligible household not later than thirty days following its filing of an application, and that the State agency shall provide each applicant household, at the time of application, a clear written statement explaining what acts the household must perform to cooperate in obtaining verification and otherwise completing the application process;

**(4)** that the State agency shall insure that each participating household receive a notice of expiration of its certification prior to the start of the last month of its certification period advising the household that it must submit a new application in order to renew its eligibility for a new certification period and, further, that each such household which seeks to be certified another time or more times thereafter by filing an application for such recertification no later than fifteen days prior to the day upon which its existing certification period expires shall, if found to be still eligible, receive its allotment no later than one month after the receipt of the last allotment issued to it pursuant to its prior certification, but if such household is found to be ineligible or to be eligible for a smaller allotment during the new certification period it shall not continue to participate and receive benefits on the basis authorized for the preceding certification period even if it makes a timely request for a fair hearing pursuant to paragraph (10) of this subsection: *Provided*, That the timeliness standards for submitting the notice of expiration and filing an application for recertification may be modified by the Secretary in light of sections 2014(f)(2) and 2015(c) of this title if administratively necessary;

**(5)** the specific standards to be used in determining the eligibility of applicant households which shall be in accordance with sections 2014 and 2015 of this title and shall include no additional requirements imposed by the State agency;

**(6)** that--

**(A)** the State agency shall undertake the certification of applicant households in accordance with the general procedures prescribed by the Secretary in the regulations issued pursuant to this chapter; and

**(B)** the State agency personnel utilized in undertaking such certification shall be employed in accordance with the current standards for a Merit System of Personnel Administration or any standards later prescribed by the Office of Personnel

Management pursuant to section 4728 of Title 42 modifying or superseding such standards relating to the establishment and maintenance of personnel standards on a merit basis;

**(7)** that an applicant household may be represented in the certification process and that an eligible household may be represented in benefit issuance or food purchase by a person other than a member of the household so long as that person has been clearly designated as the representative of that household for that purpose by the head of the household or the spouse of the head, and, where the certification process is concerned, the representative is an adult who is sufficiently aware of relevant household circumstances, except that the Secretary may restrict the number of households which may be represented by an individual and otherwise establish criteria and verification standards for representation under this paragraph;

**(8)** safeguards which prohibit the use or disclosure of information obtained from applicant households, except that--

**(A)** the safeguards shall permit--

**(i)** the disclosure of such information to persons directly connected with the administration or enforcement of the provisions of this chapter, regulations issued pursuant to this chapter, Federal assistance programs, or federally-assisted State programs; and

**(ii)** the subsequent use of the information by persons described in clause (i) only for such administration or enforcement;

**(B)** the safeguards shall not prevent the use or disclosure of such information to the Comptroller General of the United States for audit and examination authorized by any other provision of law;

**(C)** notwithstanding any other provision of law, all information obtained under this chapter from an applicant household shall be made available, upon request, to local, State or Federal law enforcement officials for the purpose of investigating an alleged violation of this chapter or any regulation issued under this chapter;

**(D)** the safeguards shall not prevent the use by, or disclosure of such information, to agencies of the Federal Government (including the United States Postal Service) for purposes of collecting the amount of an overissuance of benefits, as determined under section 2022(b) of this title, from Federal pay (including salaries and pensions) as authorized pursuant to section 5514 of Title 5 or a Federal income tax refund as authorized by section 3720A of Title 31;

**(E)** notwithstanding any other provision of law, the address, social security number, and, if available, photograph of any member of a household shall be made available, on request, to any Federal, State, or local law enforcement officer if the officer furnishes the State agency with the name of the member and notifies the agency that--

**(i)** the member--

**(I)** is fleeing to avoid prosecution, or custody or confinement after conviction, for a crime (or attempt to commit a crime) that, under the law of the place the member is fleeing, is a felony (or, in the case of New Jersey, a high misdemeanor), or is violating a condition of probation or parole imposed under Federal or State law; or

**(II)** has information that is necessary for the officer to conduct an official duty related to subclause (I);

**(ii)** locating or apprehending the member is an official duty; and

**(iii)** the request is being made in the proper exercise of an official duty; and

**(F)** the safeguards shall not prevent compliance with paragraph (15) or (18)(B) or subsection (u);

**(9)** that the State agency shall--

**(A)** provide benefits no later than 7 days after the date of application to any household which--

**(i)(I)** has gross income that is less than $150 per month; or

**(II)** is a destitute migrant or a seasonal farmworker household in accordance with the regulations governing such households in effect July 1, 1982; and

**(ii)** has liquid resources that do not exceed $100;

**(B)** provide benefits no later than 7 days after the date of application to any household that has a combined gross income and liquid resources that is less than the monthly rent, or mortgage, and utilities of the household; and

**(C)** to the extent practicable, verify the income and liquid resources of a household referred to in subparagraph (A) or (B) prior to issuance of benefits to the household;

**(10)** for the granting of a fair hearing and a prompt determination thereafter to any household aggrieved by the action of the State agency under any provision of its plan of operation as it affects the participation of such household in the supplemental nutrition assistance program or by a claim against the household for an overissuance: *Provided*, That any household which timely requests such a fair hearing after receiving individual notice of agency action reducing or terminating its benefits within the household's certification period shall continue to participate and receive benefits on the basis authorized immediately prior to the notice of adverse action until such time as the fair hearing is completed and an adverse decision rendered or until such time as the household's certification period terminates, whichever occurs earlier, except that in any case in which the State agency receives from the household a written statement containing information that clearly requires a reduction or termination of the household's benefits, the State agency may act immediately to reduce or terminate the household's benefits and may provide notice of its action to the household as late as the date on which the action becomes effective. At the option of a State, at any time prior to a fair hearing determination under this paragraph, a household may withdraw, orally or in writing, a request by the household for the fair hearing. If the withdrawal request is an oral request, the State agency shall provide a written notice to the household confirming the withdrawal request and providing the household with an opportunity to request a hearing;

**(11)** upon receipt of a request from a household, for the prompt restoration in the form of benefits to a household of any allotment or portion thereof which has been wrongfully denied or terminated, except that allotments shall not be restored for any period of time more than one year prior to the date the State agency receives a request for such restoration from a household or the State agency is notified or otherwise discovers that a loss to a household has occurred;

**(12)** for the submission of such reports and other information as from time to time may be required by the Secretary;

**(13)** for indicators of expected performance in the administration of the program;

**(14)** that the State agency shall specify a plan of operation for providing supplemental nutrition assistance program benefits for households that are victims of a disaster; that such plan shall include, but not be limited to, procedures for informing the public about the disaster program and how to apply for its benefits, coordination with Federal and private disaster relief agencies and local government officials, application procedures to reduce hardship and inconvenience and deter fraud, and instruction of caseworkers in procedures for implementing and operating the disaster program;

**(15)** notwithstanding paragraph (8) of this subsection, for the immediate reporting to the Immigration and Naturalization Service by the State agency of a determination by personnel responsible for the certification or recertification of households that any member of a household is ineligible to receive supplemental nutrition assistance program benefits because that member is present in the United States in violation of the Immigration and Nationality Act;

**(16)** at the option of the State agency, for the establishment and operation of an automatic data processing and information retrieval system that meets such conditions as the Secretary may prescribe and that is designed to provide efficient and effective administration of the supplemental nutrition assistance program;

**(17)** at the option of the State agency, that information may be requested and exchanged for purposes of income and eligibility verification in accordance with a State system which meets the requirements of section 1137 of the Social Security Act and that any additional information available from agencies administering State unemployment compensation laws under the provisions of section 303(d) of the Social Security Act may be requested and utilized by the State agency described in section 2012(s)(1) of this title to the extent permitted under the provisions of section 303(d) of the Social Security Act;

**(18)** that the State agency shall establish a system and take action on a periodic basis--

**(A)** to verify and otherwise ensure that an individual does not receive benefits in more than 1 jurisdiction within the State; and

**(B)** to verify and otherwise ensure that an individual who is placed under detention in a Federal, State, or local penal, correctional, or other detention facility for more than 30 days shall not be eligible to participate in the supplemental nutrition assistance program as a member of any household, except that--

**(i)** the Secretary may determine that extraordinary circumstances make it impracticable for the State agency to obtain information necessary to discontinue inclusion of the individual; and

**(ii)** a State agency that obtains information collected under section 1611(e)(1)(I)(i)(I) of the Social Security Act (42 U.S.C. 1382(e)(1)(I)(i)(I)) pursuant to section 1611(e)(1)(I)(ii)(II) of that Act (42 U.S.C. 1382(e)(1)(I)(ii)(II)), or under another program determined by the Secretary to be comparable to the program carried out under that section, shall be considered in compliance with this subparagraph.

**(19)** the plans of the State agency for carrying out employment and training programs under section 2015(d)(4) of this title, including the nature and extent of such programs, the geographic areas and households to be covered under such program, the extent to which such programs will be carried out in coordination with the activities carried out under title I of the Workforce Innovation and Opportunity Act (29 U.S.C. 3111 et seq.), and the basis, including any cost information, for exemptions of categories and individuals and for the choice of employment and training program components reflected in the plans;

**(20)** in a project area in which 5,000 or more households participate in the supplemental nutrition assistance program, for the establishment and operation of a unit for the detection of fraud in the supplemental nutrition assistance program, including the investigation, and assistance in the prosecution, of such fraud;

**(21)** at the option of the State, for procedures necessary to obtain payment of uncollected overissuance of benefits from unemployment compensation pursuant to section 2022(c) of this title;

**(22)** the guidelines the State agency uses in carrying out section 2015(i) of this title;

**(23)** if a State elects to carry out a simplified supplemental nutrition assistance program under section 2035 of this title, the plans of the State agency for operating the program, including--

**(A)** the rules and procedures to be followed by the State agency to determine supplemental nutrition assistance program benefits;

**(B)** how the State agency will address the needs of households that experience high shelter costs in relation to the incomes of the households; and

**(C)** a description of the method by which the State agency will carry out a quality control system under section 2025(c) of this title;

**(24)** that the State agency shall request wage data directly from the National Directory of New Hires established under section 453(i) of the Social Security Act (42 U.S.C. 653(i)) relevant to determining eligibility to receive supplemental nutrition assistance program benefits and determining the correct amount of those benefits at the time of certification;

**(25)** if the State elects to carry out a program to contract with private establishments to offer meals at concessional prices, as described in paragraphs (3), (4), and (9) of section 2012(k) of this title--

**(A)** the plans of the State agency for operating the program, including--

(i) documentation of a need that eligible homeless, elderly, and disabled clients are underserved in a particular geographic area;

(ii) the manner by which the State agency will limit participation to only those private establishments that the State determines necessary to meet the need identified in clause (i); and

(iii) any other conditions the Secretary may prescribe, such as the level of security necessary to ensure that only eligible recipients participate in the program; and

(B) a report by the State agency to the Secretary annually, the schedule of which shall be established by the Secretary, that includes--

(i) the number of households and individual recipients authorized to participate in the program, including any information on whether the individual recipient is elderly, disabled, or homeless; and

(ii) an assessment of whether the program is meeting an established need, as documented under subparagraph (A)(i); and

(26) that for a household participating in the supplemental nutrition assistance program, the State agency shall pursue clarification and verification, if applicable, of information relating to the circumstances of the household received from data matches for the purpose of ensuring an accurate eligibility and benefit determination, only if the information--

(A) appears to present significantly conflicting information from the information that was used by the State agency at the time of certification of the household;

(B) is obtained from data matches carried out under subsection (q), (r), or (x); or

(C)(i) is less than 60 days old relative to the current month of participation of the household; and

(ii) if accurate, would have been required to be reported by the household based on the reporting requirements assigned to the household by the State agency under section 2015(c) of this title.

**(f) Repealed. Pub.L. 111-296, Title II, § 241(b)(2), Dec. 13, 2010, 124 Stat. 3236**

**(g) State noncompliance; correction of failures**

If the Secretary determines, upon information received by the Secretary, investigation initiated by the Secretary, or investigation that the Secretary shall initiate upon receiving sufficient information evidencing a pattern of lack of compliance by a State agency of a type specified in this subsection, that in the administration of the supplemental nutrition assistance program there is a failure by a State agency without good cause to comply with any of the provisions of this chapter, the regulations issued pursuant

to this chapter, the State plan of operation submitted pursuant to subsection (d) of this section, the State plan for automated data processing submitted pursuant to subsection (o)(2) of this section, or the requirements established pursuant to section 2032 of this title the Secretary shall immediately inform such State agency of such failure and shall allow the State agency a specified period of time for the correction of such failure. If the State agency does not correct such failure within that specified period, the Secretary may refer the matter to the Attorney General with a request that injunctive relief be sought to require compliance forthwith by the State agency and, upon suit by the Attorney General in an appropriate district court of the United States having jurisdiction of the geographic area in which the State agency is located and a showing that noncompliance has occurred, appropriate injunctive relief shall issue, and, whether or not the Secretary refers such matter to the Attorney General, the Secretary shall proceed to withhold from the State such funds authorized under sections 2025(a), 2025(c), and 2025(g) of this title as the Secretary determines to be appropriate, subject to administrative and judicial review under section 2023 of this title.

**(h) Deposit by State to cover fraudulently or negligently issued benefits**

If the Secretary determines that there has been negligence or fraud on the part of the State agency in the certification of applicant households, the State shall, upon request of the Secretary, deposit into the Treasury of the United States, a sum equal to the face value of any benefits issued as a result of such negligence or fraud.

**(i) Application and denial procedures**

**(1) Application procedures**

Notwithstanding any other provision of law, households in which all members are applicants for or recipients of supplemental security income shall be informed of the availability of benefits under the supplemental nutrition assistance program and be assisted in making a simple application to participate in such program at the social security office and be certified for eligibility utilizing information contained in files of the Social Security Administration.

**(2) Denial and termination**

Except in a case of disqualification as a penalty for failure to comply with a public assistance program rule or regulation, no household shall have its application to participate in the supplemental nutrition assistance program denied nor its benefits under the supplemental nutrition assistance program terminated solely on the basis that its application to participate has been denied or its benefits have been terminated under any of the programs carried out under the statutes specified in the second sentence of section 2014(a) of this title and without a separate determination by the State agency that the household fails to satisfy the eligibility requirements for participation in the supplemental nutrition assistance program.

**(j) Notice of availability of benefits and applications; revision of memorandum of understanding**

**(1)** Any individual who is an applicant for or recipient of supplemental security income or social security benefits (under regulations prescribed by the Secretary in conjunction with the Commissioner of Social Security) shall be informed of the availability of benefits under the supplemental nutrition assistance program and informed of the availability of a simple application to participate in such program at the social security office.

**(2)** The Secretary and the Commissioner of Social Security shall revise the memorandum of understanding in effect on December 23, 1985, regarding services to be provided in social security offices under this subsection and subsection (i), in a manner to ensure that--

**(A)** applicants for and recipients of social security benefits are adequately notified in social security offices that assistance may be available to them under this chapter;

**(B)** applications for assistance under this chapter from households in which all members are applicants for or recipients of supplemental security income will be forwarded immediately to the State agency in an efficient and timely manner; and

**(C)** the Commissioner of Social Security receives from the Secretary reimbursement for costs incurred to provide such services.

**(k) Use of post offices**

Subject to the approval of the President, post offices in all or part of the State may provide, on request by the State agency, supplemental nutrition assistance program benefits to eligible households.

**(l) Special financial audit review of high participation States**

Whenever the ratio of a State's average supplemental nutrition assistance program participation in any quarter of a fiscal year to the State's total population in that quarter (estimated on the basis of the latest available population estimates as provided by the Department of Commerce, Bureau of the Census, Series P-25, Current Population Reports (or its successor series)) exceeds 60 per centum, the Office of the Inspector General of the Department of Agriculture shall immediately schedule a financial audit review of a sample of project areas within that State. Any financial audit review subsequent to the first such review, required under the preceding sentence, shall be conducted at the option of the Office of the Inspector General.

**(m) Alaskan fee agents; use and services**

The Secretary shall provide for the use of fee agents in rural Alaska. As used in this subsection "fee agent" means a paid agent who, although not a State employee, is authorized by the State to make applications available to low-income households, assist in the completion of applications, conduct required interviews, secure required verification, forward completed applications and supporting documentation to the State agency, and provide other services as required by the State agency. Such services shall not include making final decisions on household eligibility or benefit levels.

**(n) Verification by State agencies**

The Secretary shall require State agencies to conduct verification and implement other measures where necessary, but no less often than annually, to assure that an individual does not receive both benefits and benefits or payments referred to in section 2015(g) of this title or both benefits and assistance provided in lieu of benefits under section 2026(b)(1) of this title.

**(o) Data processing systems; model plan; comprehensive automation and computerization; State plans; evaluation and report to Congress; corrective measures by State; time for implementation**

**(1)** The Secretary shall develop, after consultation with, and with the assistance of, an advisory group of State agencies appointed by the Secretary without regard to the provisions of chapter 10 of Title 5, a model plan for the comprehensive automation of data processing and computerization of information systems under the supplemental nutrition assistance program. The plan shall be developed and made available for public comment through publication of the proposed plan in the Federal Register not later than October 1, 1986. The Secretary shall complete the plan, taking into consideration public comments received, not later than February 1, 1987. The elements of the plan may include intake procedures, eligibility determinations and calculation of benefits, verification procedures, coordination with related Federal and State programs, the issuance of benefits, reconciliation procedures, the generation of notices, and program reporting. In developing the plan, the Secretary shall take into account automated data processing and information systems already in existence in States and shall provide for consistency with such systems.

**(2)** Not later than October 1, 1987, each State agency shall develop and submit to the Secretary for approval a plan for the use of an automated data processing and information retrieval system to administer the supplemental nutrition assistance program in such State. The State plan shall take into consideration the model plan developed by the Secretary under paragraph (1) and shall provide time frames for completion of various phases of the State plan. If a State agency already has a sufficient automated data processing and information retrieval system, the State plan may, subject to the Secretary's approval, reflect the existing State system.

**(3)** Not later than April 1, 1988, the Secretary shall prepare and submit to Congress an evaluation of the degree and sufficiency of each State's automated data processing and computerized information systems for the administration of the supplemental nutrition assistance program, including State plans submitted under paragraph (2). Such report shall include an analysis of additional steps needed for States to achieve effective and cost-efficient data processing and information systems. The Secretary, thereafter, shall periodically update such report.

**(4)** Based on the Secretary's findings in such report submitted under paragraph (3), the Secretary may require a State agency, as necessary to rectify identified shortcomings in the administration of the supplemental nutrition assistance program in the State, except where such direction would displace State initiatives already under way, to take specified steps to automate data processing systems or computerize information systems for the administration of the supplemental nutrition assistance program in the State if the Secretary finds that, in the absence of such systems, there will be program accountability or integrity problems that will substantially affect the administration of the supplemental nutrition assistance program in the State.

**(5)(A)** Subject to subparagraph (B), in the case of a plan for an automated data processing and information retrieval system submitted by a State agency to the Secretary under paragraph (2), such State agency shall--

   **(i)** commence implementation of its plan not later than October 1, 1988; and

   **(ii)** meet the time frames set forth in the plan.

**(B)** The Secretary shall extend a deadline imposed under subparagraph (A) to the extent the Secretary deems appropriate based on the Secretary's finding of a good faith effort of a State agency to implement its plan in accordance with subparagraph (A).

**(p) State verification option**

In carrying out the supplemental nutrition assistance program, a State agency shall be required to use an immigration status verification system established under section 1137 of the Social Security Act (42 U.S.C. 1320b-7), and an income and eligibility verification system, in accordance with standards set by the Secretary.

**(q) Denial of benefits for prisoners**

The Secretary shall assist States, to the maximum extent practicable, in implementing a system to conduct computer matches or other systems to prevent prisoners described in subsection (e)(18)(B) from participating in the supplemental nutrition assistance program as a member of any household.

**(r) Denial of benefits for deceased individuals**

Each State agency shall--

**(1)** enter into a cooperative arrangement with the Commissioner of Social Security, pursuant to the authority of the Commissioner under section 205(r)(3) of the Social Security Act (42 U.S.C. 405(r)(3)), to obtain information on individuals who are deceased; and

**(2)** use the information to verify and otherwise ensure that benefits are not issued to individuals who are deceased.

**(s) Transitional benefits option**

**(1) In general**

A State agency may provide transitional supplemental nutrition assistance program benefits--

**(A)** to a household that ceases to receive cash assistance under a State program funded under part A of title IV of the Social Security Act (42 U.S.C. 601 et seq.); or

**(B)** at the option of the State, to a household with children that ceases to receive cash assistance under a State-funded public assistance program.

**(2) Transitional benefits period**

Under paragraph (1), a household may receive transitional supplemental nutrition assistance program benefits for a period of not more than 5 months after the date on which cash assistance is terminated.

**(3) Amount of benefits**

During the transitional benefits period under paragraph (2), a household shall receive an amount of supplemental nutrition assistance program benefits equal to the allotment received in the month immediately preceding the date on which cash assistance was terminated, adjusted for the change in household income as a result of--

**(A)** the termination of cash assistance; and

**(B)** at the option of the State agency, information from another program in which the household participates.

**(4) Determination of future eligibility**

In the final month of the transitional benefits period under paragraph (2), the State agency may--

**(A)** require the household to cooperate in a recertification of eligibility; and

**(B)** initiate a new certification period for the household without regard to whether the preceding certification period has expired.

**(5) Limitation**

A household shall not be eligible for transitional benefits under this subsection if the household--

**(A)** loses eligibility under section 2015 of this title;

**(B)** is sanctioned for a failure to perform an action required by Federal, State, or local law relating to a cash assistance program described in paragraph (1); or

**(C)** is a member of any other category of households designated by the State agency as ineligible for transitional benefits.

**(6) Applications for recertification**

**(A) In general**

A household receiving transitional benefits under this subsection may apply for recertification at any time during the transitional benefits period under paragraph (2).

**(B) Determination of allotment**

If a household applies for recertification under subparagraph (A), the allotment of the household for all subsequent months shall be determined without regard to this subsection.

**(t) Grants for simplified application and eligibility determination systems and improved access to benefits**

**(1) In general**

Subject to the availability of appropriations under section 2027(a) of this title, for each fiscal year, the Secretary shall use not more than $5,000,000 of funds made available under section 2027(a)(1) of this title to make grants to pay 100 percent of the costs of eligible entities approved by the Secretary to carry out projects to develop and implement supplemental nutrition assistance program simplified application and eligibility determination systems.

**(2) Types of projects**

A project under paragraph (1) may consist of--

**(A)** coordinating application and eligibility determination processes, including verification practices, under the supplemental nutrition assistance program and other Federal, State, and local assistance programs;

**(B)** establishing enhanced technological methods that improve the administrative infrastructure used in processing applications and determining eligibility; or

**(C)** carrying out such other activities as the Secretary determines to be appropriate.

**(3) Limitation**

A grant under this subsection shall not be made for the ongoing cost of carrying out any project.

**(4) Eligible entities**

To be eligible to receive a grant under this subsection, an entity shall be--

**(A)** a State agency administering the supplemental nutrition assistance program;

**(B)** a State or local government;

**(C)** an agency providing health or welfare services;

**(D)** a public health or educational entity; or

**(E)** a private nonprofit entity such as a community-based organization, food bank, or other emergency feeding organization.

**(5) Selection of eligible entities**

The Secretary--

**(A)** shall develop criteria for the selection of eligible entities to receive grants under this subsection; and

**(B)** may give preference to any eligible entity that consists of a partnership between a governmental entity and a nongovernmental entity.

**(u) Agreement for direct certification and cooperation**

**(1) In general**

Each State agency shall enter into an agreement with the State agency administering the school lunch program established under the Richard B. Russell National School Lunch Act (42 U.S.C. 1751 et seq.).

**(2) Contents**

The agreement shall establish procedures that ensure that--

**(A)** any child receiving benefits under this chapter shall be certified as eligible for free lunches under the Richard B. Russell National School Lunch Act (42 U.S.C. 1751 et seq.) and free breakfasts under the Child Nutrition Act of 1966 (42 U.S.C. 1771 et seq.), without further application; and

**(B)** each State agency shall cooperate in carrying out paragraphs (3)(F) and (4) of section 9(b) of the Richard B. Russell National School Lunch Act (42 U.S.C. 1758(b)).

**(v) Data exchange standards for improved interoperability**

**(1) Designation**

The Secretary shall, in consultation with an interagency work group established by the Office of Management and Budget, and considering State government perspectives, designate data exchange standards to govern, under this chapter--

**(A)** necessary categories of information that State agencies operating related programs are required under applicable law to electronically exchange with another State agency; and

**(B)** Federal reporting and data exchange required under applicable law.

**(2) Requirements**

The data exchange standards required by paragraph (1) shall, to the maximum extent practicable--

**(A)** incorporate a widely accepted, nonproprietary, searchable, computer-readable format, such as the eXtensible Markup Language;

**(B)** contain interoperable standards developed and maintained by intergovernmental partnerships, such as the National Information Exchange Model;

**(C)** incorporate interoperable standards developed and maintained by Federal entities with authority over contracting and financial assistance;

**(D)** be consistent with and implement applicable accounting principles;

**(E)** be implemented in a manner that is cost-effective and improves program efficiency and effectiveness; and

**(F)** be capable of being continually upgraded as necessary.

**(3) Rules of construction**

Nothing in this subsection requires a change to existing data exchange standards for Federal reporting found to be effective and efficient.

**(w) Advice regarding employment and training services**

For households containing at least one adult, with no elderly or disabled members and with no earned income at their last certification or required report, a State agency shall, at the time of recertification, be required to advise members of the household not exempt under section 2015(d)(2) of this title regarding available employment and training services.

**(x) National Accuracy Clearinghouse**

**(1) Definition of indication of multiple issuance**

In this subsection, the term "indication of multiple issuance" means an indication, based on a computer match, that supplemental nutrition assistance program benefits are being issued to an individual by more than 1 State agency simultaneously.

**(2) Establishment**

**(A) In general**

The Secretary shall establish an interstate data system, to be known as the "National Accuracy Clearinghouse", to prevent multiple issuances of supplemental nutrition assistance program benefits to an individual by more than 1 State agency simultaneously.

**(B) Data matching**

The Secretary shall require that State agencies make available to the National Accuracy Clearinghouse only such information as is necessary for the purpose described in subparagraph (A).

**(C) Data protection**

The information made available by State agencies under subparagraph (B)--

(i) shall be used only for the purpose described in subparagraph (A);

(ii) shall be exempt from the disclosure requirements of section 552(a) of Title 5 pursuant to section 552(b)(3) of Title 5, to the extent such information is obtained or received by the Secretary;

(iii) shall not be retained for longer than is necessary to accomplish the purpose in subparagraph (A);

(iv) shall be used in a manner that protects the identity and location of a vulnerable individual (including a victim of domestic violence) that is an applicant for, or recipient of, supplemental nutrition assistance program benefits; and

(v) shall meet security standards as determined by the Secretary.

**(3) Issuance of interim final regulations**

Not later than 18 months after December 20, 2018, the Secretary shall promulgate regulations (which shall include interim final regulations) to carry out this subsection that--

(A) incorporate best practices and lessons learned from the pilot program under section 2036c(c) of this title;

(B) require a State agency to take appropriate action, as determined by the Secretary, with respect to each indication of multiple issuance of supplemental nutrition assistance program benefits, or each indication that an individual receiving such benefits in 1 State has applied to receive such benefits in another State, while ensuring timely and fair service to applicants for, and recipients of, such benefits;

(C) establish standards to limit and protect the information submitted through or retained by the National Accuracy Clearinghouse consistent with paragraph (2)(C);

(D) establish safeguards to protect--

**(i)** the information submitted through or retained by the National Accuracy Clearinghouse, including by limiting the period of time that information is retained to the period necessary to accomplish the purpose described in paragraph (2)(A); and

**(ii)** the privacy of information that is submitted through or retained by the National Accuracy Clearinghouse consistent with subsection (e)(8); and

**(E)** include such other rules and standards the Secretary determines appropriate to carry out this subsection.

**(4) Timing**

The initial match and corresponding actions required by paragraph (3)(B) shall occur within 3 years after December 20, 2018.

## CREDIT(S)

(Pub.L. 88-525, § 11, Aug. 31, 1964, 78 Stat. 707; Pub.L. 95-113, Title XIII, § 1301, Sept. 29, 1977, 91 Stat. 969; Pub.L. 96-249, Title I, §§ 113, 116 to 120, 122, 123, May 26, 1980, 94 Stat. 361 to 363; Pub.L. 97-35, Title I, § 111(a), Aug. 13, 1981, 95 Stat. 362; Pub.L. 97-98, Title XIII, §§ 1316 to 1320(a), 1321 to 1323, Dec. 22, 1981, 95 Stat. 1286, 1287; Pub.L. 97-253, Title I, §§ 166 to 174, 180(b)(1), 189(b)(2), 190(c)(1), Sept. 8, 1982, 96 Stat. 779, 780, 783, 787; Pub.L. 98-204, § 7, Dec. 2, 1983, 97 Stat. 1386; Pub.L. 98-369, Div. B, Title VI, § 2651(i), July 18, 1984, 98 Stat. 1150; Pub.L. 99-198, Title XV, §§ 1507(b), 1517(b), 1525 to 1531(b), 1535(b)(1), 1537(b), (c), Dec. 23, 1985, 99 Stat. 1568, 1576, 1580 to 1582, 1584, 1586, 1587; Pub.L. 100-77, Title VIII, §§ 808(a), 809(a), July 22, 1987, 101 Stat. 536; Pub.L. 100-435, Title II, § 204(a), Title III, §§ 310, 311, 320, 321(a), 322, 323, 330, 352, Sept. 19, 1988, 102 Stat. 1657, 1660 to 1662, 1665; Pub.L. 101-624, Title XVII, §§ 1736 to 1741, 1763(b), Nov. 28, 1990, 104 Stat. 3793, 3794, 3806; Pub.L. 102-237, Title IX, § 941(5), (6), Dec. 13, 1991, 105 Stat. 1892; Pub.L. 103-66, Title XIII, § 13941(a), Aug. 10, 1993, 107 Stat. 676; Pub.L. 103-296, Title I, § 108(f)(2), (3), Aug. 15, 1994, 108 Stat. 1487; Pub.L. 104-66, Title I, § 1011(x), Dec. 21, 1995, 109 Stat. 711; Pub.L. 104-193, Title VIII, §§ 809(b), 819(b), 835 to 840, 844(b), 848(b)(1), 854(b), Aug. 22, 1996, 110 Stat. 2313, 2320, 2329 to 2331, 2333, 2334, 2342; Pub.L. 105-33, Title I, §§ 1003(a)(1), (2), (b), 1004, Aug. 5, 1997, 111 Stat. 255, 256; Pub.L. 105-379, § 1(a), Nov. 12, 1998, 112 Stat. 3399; Pub.L. 107-171, Title IV, §§ 4114(a), 4115(a), 4116(a), May 13, 2002, 116 Stat. 314, 315; Pub.L. 108-265, Title I, § 104(b)(2), June 30, 2004, 118 Stat. 737; Pub.L. 110-234, Title IV, §§ 4001(b), 4002(a)(6), 4106, 4111(b), 4115(b)(8), 4116 to 4120, 4406(a)(2), Title VII, § 7511(c)(5), May 22, 2008, 122 Stat. 1092, 1093, 1101, 1102, 1107, 1110, 1140, 1267; Pub.L. 110-246, § 4(a), Title IV, §§ 4001(b), 4002(a)(6), 4106, 4111(b), 4115(b)(8), 4116 to 4120, 4406(a)(2), Title VII, § 7511(c)(5), June 18, 2008, 122 Stat. 1664, 1853, 1854, 1862, 1863, 1868, 1871, 1902, 2029; Pub.L. 111-296, Title II, § 241(b)(2), Dec. 13, 2010, 124 Stat. 3236; Pub.L. 113-79, Title IV, §§ 4013, 4014(a), 4015, 4016(a), Feb. 7, 2014, 128 Stat. 793, 795; Pub.L. 115-334, Title IV, §§ 4005(c), 4009 to 4011, 4013(a), 4022(5), Dec. 20, 2018, 132 Stat. 4632, 4639, 4642, 4653; Pub.L. 117-286, § 4(a)(27), Dec. 27, 2022, 136 Stat. 4308.)

## EXECUTIVE ORDERS

## EXECUTIVE ORDER NO. 12116

<Jan. 19, 1979, 44 F.R. 4647>

**Issuance of Food Stamps by Postal Service**

By the authority vested in me as President of the United States of America by Section 11(k) of the Food Stamp Act of 1977 (91 Stat. 974; 7 U.S.C. 2020(k) [subsec. (k) of this section], the United States Postal Service is hereby granted approval for post offices in all or part of any State to issue food stamps to eligible households, upon request by the appropriate State agency, as defined in Section 3(n) of the Food Stamp Act of 1977 (91 Stat. 960; 7 U.S.C. 2012(n) ) [section 2012(n) of this title].

JIMMY CARTER

Notes of Decisions (86)

7 U.S.C.A. § 2020, 7 USCA § 2020
Current through P.L. 118-22. Some statute sections may be more current, see credits for details.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX 3

**Federal regulations from
Code of Federal Regulations**

Code of Federal Regulations
  Title 7. Agriculture
    Subtitle B. Regulations of the Department of Agriculture
      Chapter II. Food and Nutrition Service, Department of Agriculture (Refs & Annos)
        Subchapter C. Supplemental Nutrition Assistance and Food Distribution Program (Refs & Annos)
          Part 273. Certification of Eligible Households (Refs & Annos)
            Subpart F. Disqualification and Claims (Refs & Annos)

7 C.F.R. § 273.17

§ 273.17 Restoration of lost benefits.

Currentness

(a) Entitlement.

(1) The State agency shall restore to households benefits which were lost whenever the loss was caused by an error by the State agency or by an administrative disqualification for intentional Program violation which was subsequently reversed as specified in paragraph (e) of this section, or if there is a statement elsewhere in the regulations specifically stating that the household is entitled to restoration of lost benefits. Furthermore, unless there is a statement elsewhere in the regulations that a household is entitled to lost benefits for a longer period, benefits shall be restored for not more than twelve months prior to whichever of the following occurred first:

(i) The date the State agency receives a request for restoration from a household; or

(ii) The date the State agency is notified or otherwise discovers that a loss to a household has occurred.

(2) The State agency shall restore to households benefits which were found by any judicial action to have been wrongfully withheld. If the judicial action is the first action the recipient has taken to obtain restoration of lost benefits, then benefits shall be restored for a period of not more than twelve months from the date the court action was initiated. When the judicial action is a review of a State agency action, the benefits shall be restored for a period of not more than twelve months from the first of the following dates:

(i) The date the State agency receives a request for restoration:

(ii) If no request for restoration is received, the date the fair hearing action was initiated; but

(iii) Never more than one year from when the State agency is notified of, or discovers, the loss.

(3) Benefits shall be restored even if the household is currently ineligible.

(b) Errors discovered by the State agency. If the State agency determines that a loss of benefits has occurred, and the household is entitled to restoration of those benefits, the State agency shall automatically take action to restore any benefits that were lost. No action by the household is necessary. However, benefits shall not be restored if the benefits were lost more than 12 months prior to the month the loss was discovered by the State agency in the normal course of business, or were lost more than 12 months prior to the month the State agency was notified in writing or orally of a possible loss to a specific household. The State agency shall notify the household of its entitlement, the amount of benefits to be restored, any offsetting that was done, the method of restoration, and the right to appeal through the fair hearing process if the household disagrees with any aspect of the proposed lost benefit restoration.

(c) Disputed benefits.

(1) If the State agency determines that a household is entitled to restoration of lost benefits, but the household does not agree with the amount to be restored as calculated by the State agency or any other action taken by the State agency to restore lost benefits, the household may request a fair hearing within 90 days of the date the household is notified of its entitlement to restoration of lost benefits. If a fair hearing is requested prior to or during the time lost benefits are being restored, the household shall receive the lost benefits as determined by the State agency pending the results of the fair hearing. If the fair hearing decision is favorable to the household, the State agency shall restore the lost benefits in accordance with that decision.

(2) If a household believes it is entitled to restoration of lost benefits but the State agency, after reviewing the case file, does not agree, the household has 90 days from the date of the State agency determination to request a fair hearing. The State agency shall restore lost benefits to the household only if the fair hearing decision is favorable to the household. Benefits lost more than 12 months prior to the date the State agency was initially informed of the household's possible entitlement to lost benefits shall not be restored.

(d) Computing the amount to be restored. After correcting the loss for future months and excluding those months for which benefits may have been lost prior to the 12–month time limits described in paragraphs (b) and (c) of this section, the State agency shall calculate the amount to be restored as follows:

(1) If the household was eligible but received an incorrect allotment, the loss of benefits shall be calculated only for those months the household participated. If the loss was caused by an incorrect delay, denial, or termination of benefits, the months affected by the loss shall be calculated as follows:

(i) If an eligible household's application was erroneously denied, the month the loss initially occurred shall be the month of application, or for an eligible household filing a timely reapplication, the month following the expiration of its certification period.

(ii) If an eligible household's application was delayed, the months for which benefits may be lost shall be calculated in accordance with procedures in § 273.2(h).

(iii) If a household's benefits were erroneously terminated, the month the loss initially occurred shall be the first month benefits were not received as a result of the erroneous action.

(iv) After computing the date the loss initially occurred, the loss shall be calculated for each month subsequent to that date until either the first month the error is corrected or the first month the household is found ineligible.

(2) For each month affected by the loss, the State agency shall determine if the household was actually eligible. In cases where there is no information in the household's case file to document that the household was actually eligible, the State agency shall advise the household of what information must be provided to determine eligibility for these months. For each month the household cannot provide the necessary information to demonstrate its eligibility, the household shall be considered ineligible.

(3) For the months the household was eligible, the State agency shall calculate the allotment the household should have received. If the household received a smaller allotment than it was eligible to receive, the difference between the actual and correct allotments equals the amount to be restored.

(4) If a claim against a household is unpaid or held in suspense as provided in § 273.18, the amount to be restored shall be offset against the amount due on the claim before the balance, if any, is restored to the household. At the point in time when the household is certified and receives an initial allotment, the initial allotment shall not be reduced to offset claims, even if the initial allotment is paid retroactively.

(e) *Lost benefits to individuals disqualified for intentional Program violation.* Individuals disqualified for intentional Program violation are entitled to restoration of any benefits lost during the months that they were disqualified, not to exceed twelve months prior to the date of State agency notification, only if the decision which resulted in disqualification is subsequently reversed. For example, an individual would not be entitled to restoration of lost benefits for the period of disqualification based solely on the fact that a criminal conviction could not be obtained, unless the individual successfully challenged the disqualification period imposed by an administrative disqualification in a separate court action. For each month the individual was disqualified, not to exceed twelve months prior to State agency notification, the amount to be restored, if any, shall be determined by comparing the allotment the household received with the allotment the household would have received had the disqualified member been allowed to participate. If the household received a smaller allotment than it should have received, the difference equals the amount to be restored. Participation in an administrative disqualification hearing in which the household contests the State agency assertion of intentional Program violation shall be considered notification that the household is requesting restored benefits.

(f) *Method of restoration.* Regardless of whether a household is currently eligible or ineligible, the State agency shall restore lost benefits to a household by issuing an allotment equal to the amount of benefits that were lost. The amount restored shall be issued in addition to the allotment currently eligible households are entitled to receive. The State agency shall honor reasonable requests by households to restore lost benefits in monthly installments if, for example, the household fears the excess coupons may be stolen, or that the amount to be restored is more than it can use in a reasonable period of time.

(g) *Changes in household composition.* Whenever lost benefits are due a household and the household's membership has changed, the State agency shall restore the lost benefits to the household containing a majority of the individuals who were household members at the time the loss occurred. If the State agency cannot locate or determine the household which contains a majority of household members the State agency shall restore the lost benefits to the household containing the head of the household at the time the loss occurred.

(h) Accounting procedures. Each State agency shall be responsible for maintaining an accounting system for documenting a household's entitlement to restoration of lost benefits and for recording the balance of lost benefits that must be restored to the household. Each State agency shall at a minimum, document how the amount to be restored was calculated and the reason lost benefits must be restored. The accounting system shall be designed to readily identify those situations where a claim against a household can be used to offset the amount to be restored.

**Credits**
[Amdt. 132, 43 FR 47889, Oct. 17, 1978; Amdt. 225, 48 FR 16831, April 19, 1983; Amdt. 314, 54 FR 24518, June 7, 1989; Amdt. 356, 59 FR 29713, June 9, 1994]

SOURCE: Amdt. 132, 43 FR 47889, Oct. 17, 1978; 51 FR 10786, March 28, 1986; 51 FR 42994, Nov. 28, 1986; 52 FR 11814, April 13, 1987; 56 FR 12845, March 28, 1991; 58 FR 215, Jan. 5, 1993; Amdt. 373, 64 FR 38293, July 16, 1999; 75 FR 4953, Jan. 29, 2010; 82 FR 2034, 2035, Jan. 6, 2017; 82 FR 11131, Feb. 21, 2017; 84 FR 15093, April 15, 2019; 85 FR 52031, Aug. 24, 2020, unless otherwise noted.

AUTHORITY: 7 U.S.C. 2011–2036.

Notes of Decisions (61)

Current through Dec. 12, 2023, 88 FR 86255. Some sections may be more current. See credits for details.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 7. Agriculture
    Subtitle B. Regulations of the Department of Agriculture
      Chapter II. Food and Nutrition Service, Department of Agriculture (Refs & Annos)
        Subchapter C. Supplemental Nutrition Assistance and Food Distribution Program (Refs & Annos)
          Part 276. State Agency Liabilities and Federal Sanctions (Refs & Annos)

7 C.F.R. § 276.2

§ 276.2 State agency liabilities.

Effective: January 14, 2011
Currentness

(a) General provisions. Notwithstanding any other provision of this subchapter, State agencies shall be responsible to FNS for any financial losses involved in the acceptance, storage and issuance of coupons. All coupon issuance shall be documented, and the State agency shall make available to the Department all primary documentation (or secondary, if the primary has been inadvertently destroyed) when required to do so. State agencies shall pay to FNS, upon demand, the amount of any such losses.

(b) Coupon shortages, losses, unauthorized issuances, overissuances and undocumented issuances.

(1) State agencies shall be strictly liable for:

(i) Coupon shortages and losses that occur any time after coupons have been accepted by receiving points within the State and that occur during storage or the movement of coupons between bulk storage point issuers and claims collection points within the State;

(ii) Losses resulting from authorization documents lost in transit from a manufacturer to the State agency and untransacted authorization documents lost in transit from an issuer to the State agency; and

(iii) The value of coupons overissued and coupons issued without authorization, except for those duplicate issuances in the correct amount that are the result of replacement issuances made in accordance with § 274.6. Overissuances and unauthorized issuances for which State agencies are liable include, but are not limited to: Single unmatched issuances, duplicates made that are not in accordance with § 274.6, and transacted authorization documents that are altered, counterfeit, from out-of-State or expired (including those unsigned by the designated household member and/or not date stamped by the issuer).

(2) Coupon shortages and/or losses for which State agencies shall be held strictly liable include, but are not limited to, the following:

(i) Thefts;

(ii) Embezzlements;

(iii) Cashier errors (e.g., errors by the personnel of issuance offices in the counting of coupon books);

(iv) Coupons lost in natural disasters if a State agency cannot provide reasonable evidence that the coupons were destroyed and not redeemed;

(v) Issuances which cannot be supported by the required documentation;

(vi) Issuances made to households not currently certified;

(vii) Issuance loss during an official investigation, unless the investigation was reported directly to FNS prior to the loss; and

(viii) Unexplained causes.

(3) State agencies shall submit written reports on significant losses unless those losses were investigated by the Office of the Inspector General, USDA.

(4) A State agency shall be held strictly liable for mail issuance losses that are in excess of the tolerance level that corresponds to the preselected reporting unit. Each State agency shall select one of the three following units annually and report the selection as provided in §§ 272.2(a)(2) and 272.2(d)(1)(iii). Where reporting units issue less than $300,000 in mail issuance in a quarter, the State agency shall be liable for all losses in excess of $1,500 for the quarter.

(i) If a State agency elects to report and have liabilities based on an existing county or project area level of mail issuance, then the State agency shall be strictly liable to FNS for the value of all mail issuance losses in excess of five-tenths (.5) percent of the dollar value of each reporting unit's quarterly mail issuance. This level shall be used if the State agency does not designate one of the three levels herein by May 15, 1989, and by August 15 in years thereafter.

(ii) If a State agency elects to report and have liabilities based on an existing administrative level higher than the county or project area provided in paragraph (b)(4)(i) of this section, but lower than the Statewide level of mail issuance provided in paragraph (b)(4)(iii) of this section, then the State agency shall be strictly liable to FNS for the value of all mail issuance losses in excess of thirty-five hundredths (.35) percent per quarter of the dollar value of each reporting unit's quarterly mail issuance. State agencies shall not create new administrative units for the sole purpose of reporting mail issuance losses.

(iii) If a State agency elects to report and have liabilities based on a State level of mail issuance, then the State agency shall be strictly liable to FNS for the value of all mail issuance losses in excess of thirty hundredths (.30) percent per quarter of the dollar value of each State agency's total quarterly mail issuance.

(iv) FNS reserves the right to make all determinations on reporting requirements and on administrative divisions within the State for the purpose of determining and assessing liability for mail issuance losses. FNS also reserves the right to revise

such determinations as necessary. Revisions will be communicated to State agencies by FNS. The liability assessment will be based on the revised reporting requirement for the next full fiscal quarter.

(v) For the purpose of this section, "mail issuance" means all original coupon issuances distributed through the mail. "Mail loss" means all replacements of mail issuances except for replacements of returned mail issuances.

(vi) The State agency's liability shall be computed using data from Form FNS–259, Food Stamp Mail Issuance Report, or alternative reporting document accepted in advance by FNS and the State agency, which is submitted for the quarter for the particular reporting unit agreed to by FNS and the State agency, as provided in §§ 272.2(a)(2) and 272.2(d)(1)(iii).

(5) State agencies shall be held strictly liable for the following overissuances:

(i) The value of overissued coupons issued as a result of a State agency's failure to comply with a directive issued by FNS in accordance with the provisions of § 271.7, to reduce, suspend or cancel allotments;

(ii) The value of coupons overissued by the State agency as a result of a court order or settlement agreement of a court suit which was not reported to FNS in accordance with the provisions of § 272.4(e); and

(iii) The value of coupons overissued as a result of a State agency entering into an out-of-court settlement of a court suit, the terms of which violate Federal laws or regulations.

(6) Coupon shortages and losses shall be determined from the Form FNS–250, Food Coupon Accountability Report and its supporting documents and from the Form FNS–46, Issuance System Reconciliation Report. Losses of Federal moneys resulting from overissuances shall be determined from sources such as audits, Performance Reporting System Reviews, Federal reviews, investigations and explanatory reports prepared by the State agency.

(7) State agencies shall be held strictly liable for overissuances resulting from Electronic Benefit Transfer system errors and unauthorized account activities. Such overissuances shall include but not be limited to: Overissuances to household accounts that are accessed and used by households, replacement benefits to a household's account due to unauthorized use of the benefits in a household's account, benefits drawn from an EBT account after the household has reported that the EBT card is lost or stolen to the State or its agent, overdraft situations due to the use of manual back-up procedures approved by the State agency, overcredits to a retailer account and transfer of funds to an illegitimate account.

(c) Cash Losses. State agencies are liable to FNS for cash losses when money collected by State agencies from recipient claims has been lost, stolen or otherwise not remitted to FNS in accordance with the provision of § 273.18(l). The amount of such losses shall be determined from the sources outlined in paragraph (6) of this section.

(d) State agency payment to FNS. State agencies shall be billed for the exact amount of losses specified in this section. If a State agency fails to pay the billing, FNS shall offset the amount of loss from the State agency's Letter of Credit in accordance with § 277.16(c).

**Credits**

[Amdt. 168, 45 FR 77263, Nov. 21, 1980, as amended by Amdt. 227, 47 FR 49012, Oct. 29, 1982; Amdt. 229, 47 FR 50683, Nov. 9, 1982; 48 FR 6865, Feb. 15, 1983; 48 FR 15226, April 8, 1983; 52 FR 26941, July 17, 1987; 54 FR 7016, Feb. 15, 1989; 54 FR 12175, March 24, 1989; 54 FR 51351, Dec. 15, 1989; 57 FR 11259, April 1, 1992; 57 FR 44791, Sept. 29, 1992; Amdt. 342, 59 FR 2733, Jan. 19, 1994; Amdt. 381, 65 FR 64589, Oct. 30, 2000; 75 FR 78154, Dec. 15, 2010]

SOURCE: Amdt. 168, 45 FR 77263, Nov. 21, 1980; 51 FR 10782, March 28, 1986; 51 FR 42994, Nov. 28, 1986; 56 FR 12845, March 28, 1991; 58 FR 215, Jan. 15, 1993; Amdt. 373, 64 FR 38293, July 16, 1999; 82 FR 2034, Jan. 6, 2017; 82 FR 11131, Feb. 21, 2017; 85 FR 52031, Aug. 24, 2020, unless otherwise noted.

AUTHORITY: 7 U.S.C. 2011–2036.

Notes of Decisions (31)

Current through Dec. 11, 2023, 88 FR 85851. Some sections may be more current. See credits for details.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
    Title 7. Agriculture
        Subtitle B. Regulations of the Department of Agriculture
            Chapter II. Food and Nutrition Service, Department of Agriculture (Refs & Annos)
                Subchapter C. Supplemental Nutrition Assistance and Food Distribution Program (Refs & Annos)
                    Part 277. Payments of Certain Administrative Costs of State Agencies (Refs & Annos)

7 C.F.R. § 277.18

§ 277.18 State Systems Advance Planning Document (APD) process.

Effective: September 28, 2016
Currentness

(a) Scope and application. This section establishes conditions for initial and continuing authority to claim Federal financial participation (FFP) for the costs of the planning, development, acquisition, installation and implementation of Information System (IS) equipment and services used in the administration of the Supplemental Nutrition Assistance Program (SNAP) and as prescribed by appropriate Food and Nutrition Service (FNS) directives and guidance (i.e., FNS Handbook 901, OMB Circulars, etc.).

(b) Definitions. As used in this section:

Acquisition means obtaining supplies or services through a purchase or lease, regardless of whether the supplies or services are already in existence or must be developed, created or evaluated.

Advance Planning Document for project planning or Planning APD (APD or PAPD) means a brief written plan of action that requests FFP to accomplish the planning activities necessary for a State agency to determine the need for, feasibility of, projected costs and benefits of an IS equipment or services acquisition, plan the acquisition of IS equipment and/or services, and to acquire information necessary to prepare an Implementation APD.

Advance Planning Document Update (APDU) means a document submitted annually (Annual APDU) by the State agency to report the status of project activities and expenditures in relation to the approved Planning APD or Implementation APD; or on an as needed basis (As Needed APDU) to request funding approval for project continuation when significant project changes occur or are anticipated.

Commercial Off-the–Shelf (COTS) means proprietary software products that are ready-made and available for sale to the general public at established catalog or market prices in which the software vendor is not positioned as the sole implementer or integrator of the product.

Enhancement means modifications which change the functions of software and hardware beyond their original purposes, not just to correct errors or deficiencies which may have been present in the software or hardware, or to improve the operational performance of the software or hardware. Software enhancements that substantially increase risk or cost or functionality will require submission of an IAPD or an As Needed IAPDU.

Implementation Advance Planning Document or Implementation APD (IAPD) means a written plan of action requesting FFP to acquire and implement information system (IS) services and/or equipment. The Implementation APD includes the design, development, testing and implementation phases of the project.

Information System (IS) means a combination of hardware and software, data and telecommunications that performs specific functions to support the State agency, or other Federal, State or local organization.

Project means a related set of information technology related tasks, undertaken by a State, to improve the efficiency, economy and effectiveness of administration and/or operation of its human services programs. A project may also be a less comprehensive activity such as office automation, enhancements to an existing system, or an upgrade of computer hardware.

Request for Proposal (RFP) means the document used for public solicitations of competitive proposals from qualified sources as outlined in § 277.14(g)(3).

(c) Requirements for FNS prior approval of IS projects—

(1) General prior approval requirements. The State agency shall request prior FNS approval by submitting the Planning APD, the Implementation APD, an APD Update, the draft acquisition instrument, and/or the justification for the sole source acquisition if applicable, as specified in paragraph (c)(2) of this section. A State agency must obtain written approval from FNS to receive FFP of any of the following activities:

(i) When it plans a project to enhance or replace its IS that it anticipates will have total project costs in Federal and State funds of $6 million or more.

(ii) Any IS competitive acquisition that costs $6 million or more in Federal and State funds.

(iii) When the State agency plans to acquire IS equipment or services non-competitively from a nongovernmental source, and the total State and Federal cost is more than $1 million.

(iv) For the acquisition of IS equipment or services to be utilized in an Electronic Benefit Transfer (EBT) system regardless of the cost of the acquisition in accordance with § 274.12 (EBT issuance system approval standards).

(2) Specific prior approval requirements.

(i) For IS projects which require prior approval, as specified in paragraph (c)(1) of this section, the State agency shall obtain the prior written approval of FNS for:

(A) Conducting planning activities, entering into contractual agreements or making any other commitment for acquiring the necessary planning services;

(B) Conducting design, development, testing or implementation activities, entering into contractual agreements or making any other commitment for the acquisition of IS equipment or services.

(ii) For IS equipment and services acquisitions requiring prior approval as specified in paragraph (c)(1) of this section, prior approval of the following documents associated with such acquisitions is also required:

(A) Requests for Proposals (RFPs). Unless specifically exempted by FNS, the State agency shall obtain prior written approval of the RFP before the RFP may be released. However, RFPs for acquisitions estimated to cost less than $6 million or competitive procurements from non-governmental sources and that are an integral part of the approved APD, need not receive prior approval from FNS. The State agency shall submit a written request to get prior written approval to acquire IS equipment or services non-competitively from a nongovernmental source when the total State and Federal cost is $1 million or more. State agencies shall submit RFPs under this threshold amount on an exception basis. The State agency shall obtain prior written approval from FNS for RFPs which are associated with an EBT system regardless of the cost.

(B) Contracts. All contracts must be submitted to FNS. Unless specifically exempted by FNS, the State agency shall obtain prior written approval before the contract may be signed by the State agency. However, contracts for competitive procurements costing less than $6 million and for noncompetitive acquisitions from nongovernmental sources costing less than $1 million and that are an integral part of the approved APD need not be submitted to FNS. State agencies shall submit contracts under this threshold amount on an exception basis. The State agency shall obtain prior written approval from FNS for contracts which are associated with an EBT system regardless of the cost.

(C) Contract amendments. All contract amendments must be submitted to FNS. Unless specifically exempted by FNS, the State agency shall obtain prior written approval from FNS of any contract amendments which cumulatively exceed 20 percent of the base contract costs before being signed by the State agency. The State agency shall obtain prior written approval from FNS for contracts which are associated with an EBT system regardless of the cost.

(iii) Procurement requirements.

(A) Procurements of IS equipment and services are subject to § 277.14 (procurement standards) regardless of any conditions for prior approval contained in this section, except the requirements of § 277.14(b)(1) and (b)(2) regarding review of proposed contracts. Those procurement standards include a requirement for maximum practical open and free competition regardless of whether the procurement is formally advertised or negotiated.

(B) The standards prescribed by § 277.14, as well as the requirement for prior approval in this paragraph (c), apply to IS services and equipment acquired primarily to support SNAP regardless of the acquiring entity.

(C) The competitive procurement policy prescribed by § 277.14 shall be applicable except for IS services provided by the agency itself, or by other State or local agencies.

(iv) The State agency must obtain prior written approval from FNS, as specified in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, to claim and receive reimbursement for the associated costs of the IS acquisition.

(3) Document submission requirements.

(i) For IS projects requiring prior approval as specified in paragraphs (c)(1) and (c)(2) of this section, the State agency shall submit the following documents to FNS for approval:

(A) Planning APD as described in paragraph (d)(1) of this section.

(B) Implementation APD as described in paragraph (d)(2) of this section.

(C) Annual APDU as described in paragraph (d)(3) of this section. The Annual APDU shall be submitted to FNS 60 days prior to the expiration of the FFP approval, unless the submission date is specifically altered by FNS. In years where an As Needed APDU is required, as described in paragraph (c)(3)(i)(D) of this section, FNS may waive or modify the requirement to submit the annual APDU.

(D) As Needed APDU as described in paragraph (d)(4) of this section. As Needed APDU are required to obtain a commitment of FFP whenever significant project changes occur. Significant project changes are defined as changes in cost, schedule, scope or strategy which exceed FNS–defined thresholds or triggers. Without such approval, the State agency is at risk for funding of project activities which are not in compliance with the terms and conditions of the approved APD and subsequently approved APDU until such time as approval is specifically granted by FNS.

(E) Acquisition documents as described in § 277.14(g).

(F) Emergency Acquisition Requests as described in paragraph (i) of this section.

(ii) The State agency must obtain prior FNS approval of the documents specified in paragraph (c)(3)(i) of this section in order to claim and receive reimbursement for the associated costs of the IS acquisition.

(4) Approval by the State agency. Approval by the State agency is required for all documents and acquisitions specified in § 277.18 prior to submission for FNS approval. However, the State agency may delegate approval authority to any subordinate entity for those acquisitions of IS equipment and services not requiring prior approval by FNS.

(5) Prompt action on requests for prior approval. FNS will reply promptly to State agency requests for prior approval. If FNS has not provided written approval, disapproval or a request for additional information within 60 days of FNS' acknowledgment of receipt of the State agency's request, the request will be deemed to have provisionally met the prior approval requirement in this paragraph (c). However, provisional approval will not exempt a State agency from having to meet all other Federal requirements which pertain to the acquisition of IS equipment and services. Such requirements remain subject to Federal audit and review.

(d) APD content requirements—

(1) Planning APD (PAPD). The PAPD is a written plan of action to acquire proposed services or equipment and to perform necessary activities to investigate the feasibility, system alternatives, requirements and resources needed to replace, modify or upgrade the State agency's IS. The PAPD shall contain adequate documentation to demonstrate the need to undertake a

planning process, as well as a thorough description of the proposed planning activities, and estimated costs and timeline, as specified by FNS in Handbook 901.

(2) Implementation APD (IAPD). The IAPD is a written plan of action to acquire the proposed IS services or equipment and to perform necessary activities to design, develop, acquire, install, test, and implement the new IS. The IAPD shall contain detailed documentation of planning and preparedness for the proposed project, as enumerated by FNS in Handbook 901, demonstrating the feasibility of the project, thorough analysis of system requirements and design, a rigorous management approach, stewardship of federal funds, a realistic schedule and budget, and preliminary plans for key project phases.

(3) Annual APDU content requirements. The Annual APDU is a yearly update to ongoing IS projects when planning or implementation activities occur. The Annual APDU shall contain documentation on the project activity status and a description of major tasks, milestones, budget and any changes, as specified by FNS in Handbook 901.

(4) As Needed APDU content requirements. The As Needed APDU document shall contain the items as defined in paragraph (c)(3)(i)(D) of this section with emphasis on the area(s) where changes have occurred or are anticipated that triggered the submission of the APDU, as detailed by FNS in Handbook 901.

(e) Service agreements. The State agency shall execute service agreements when IS services are to be provided by a State central IT facility or another State or local agency. Service Agreement means the document signed by the State or local agency and the State or local central IT facility whenever an IT facility provides IT services to the State or local agency. Service agreements shall:

(1) Identify the IS services that will be provided;

(2) Include a schedule of rates for each identified IS service, and a certification that these rates apply equally to all users;

(3) Include a description of the method(s) of accounting for the services rendered under the agreement and computing services charges;

(4) Include assurances that services provided will be timely and satisfactory;

(5) Include assurances that information in the IS as well as access, use and disposal of IS data will be safeguarded in accordance with provisions of § 272.1(c) (disclosure) and § 277.13 (property);

(6) Require the provider to obtain prior approval from FNS pursuant to paragraph (c)(1) of this section for IS equipment and IS services that are acquired from commercial sources primarily to support federally aided public assistance programs and require the provider to comply with § 277.14 (procurement standards) for procurements related to the service agreement. IS equipment and services are considered to be primarily acquired to support federally aided public assistance programs when the Programs may reasonably be expected to either be billed for more than 50 percent of the total charges made to all users of the IS equipment and services during the time period covered by the service agreement, or directly charged for the total cost of the purchase or lease of IS equipment or services;

(7) Include the beginning and ending dates of the period of time covered by the service agreement; and

(8) Include a schedule of expected total charges to the Program for the period of the service agreement.

(9) State Agency Maintenance of Service Agreements. The State agency shall maintain a copy of each service agreement in its files for Federal review upon request.

(f) Conditions for receiving Federal financial participation (FFP)—

(1) A State agency may receive FFP at the 50 percent reimbursement rate for the costs of planning, design, development or installation of IS and information retrieval systems if the proposed system will:

(i) Assist the State agency in meeting the requirements of the Food and Nutrition Act of 2008, as amended;

(ii) Meet the Automation of Data Processing/Computerization of Information Systems Model Plan program standards specified in § 272.10(b)(1) through (b)(3) of this chapter, except the requirements in § 272.10(b)(2)(vi), (b)(2)(vii), and (b)(3)(ix) of this chapter to eventually transmit data directly to FNS;

(iii) Be likely to provide more efficient and effective administration of the program; and

(iv) Be compatible with such other systems utilized in the administration of other State agency programs including the program of Temporary Assistance for Needy Families (TANF).

(2) State agencies seeking FFP for the planning, design, development or installation of IS shall develop State wide systems which are integrated with TANF. In cases where a State agency can demonstrate that a local, dedicated, or single function (issuance or certification only) system will provide for more efficient and effective administration of the program, FNS may grant an exception to the State wide integrated requirement. These exceptions will be based on an assessment of the proposed system's ability to meet the State agency's need for automation. Systems funded as exceptions to this rule, however, should be capable to the extent necessary, of an automated data exchange with the State agency system used to administer TANF. In no circumstances will funding be available for systems which duplicate other State agency systems, whether presently operational or planned for future development.

(g) Basis for continued Federal financial participation (FFP)—

(1) FNS will continue FFP at the levels approved in the Planning APD and the Implementation APD provided that project development proceeds in accordance with the conditions and terms of the approved APD and that IS resources are used for the purposes authorized. FNS will use the APDU to monitor IS project development. The submission of the Update as prescribed in § 277.18(d) for the duration of project development is a condition for continued FFP. In addition, periodic onsite reviews of IS project development and State and local agency IS operations may be conducted by or for FNS to assure compliance with approved APDs, proper use of IS resources, and the adequacy of State or local agency IS operations.

(2) Pre-implementation. The State agency must demonstrate through thorough testing that the system meets all program functional and performance requirements. FNS may require a pre-implementation review of the system to validate system functionality prior to State agency testing.

(i) Testing. The State agency must provide a complete test plan prior to the start of the testing phase. The State agency must provide documentation to FNS of the results of User Acceptance Testing (UAT) before the system is piloted in a production environment. FNS concurrence to advance from testing to pilot is a condition for continued FFP. All aspects of program eligibility must be tested to ensure that the system makes accurate eligibility determinations in accordance with federal statutes and regulations and approved State policies, and that system functionality meets the required functional specifications. The State agency shall describe how all system testing will be conducted and the resources to be utilized in order to verify the system complies with SNAP requirements, system design specifications, and performance standards including responsiveness, usability, capacity and security. Testing includes but is not limited to unit testing, integration testing, performance testing, end-to-end testing, UAT and regression testing. During UAT detailed scripts covering all areas of program functionality shall be used so that any errors identified can be replicated, corrected and re-tested. At a minimum, the Test Plan shall address:

(A) The types of testing to be performed;

(B) The organization of the test team and associated responsibilities;

(C) Test database generation;

(D) Test case development;

(E) Test schedule;

(F) Documentation of test results;

(G) Acceptance testing, to include functional requirements testing, error condition handling and destructive testing, security testing, recovery testing, controls testing, stress and throughput performance testing, and regression testing; and

(H) The decision criteria, including specific test results which must be met before the State may exit the testing phase, the roles or titles of the individuals responsible for verifying that these criteria have been met, and the sign-off process which will document that the criteria have been met.

(I) FNS may require any or all of these tests to be repeated in instances where significant modifications are made to the system after these tests are initially completed or if problems that surfaced during initial testing warrant a retest. FNS reserves the right to participate and conduct independent testing, as necessary, during UAT and at appropriate times during system design, development, implementation and operations.

(ii) Pilot. Prior to statewide rollout of the system there must be a test of the fully operational system in a live production environment. Pilots must operate until a state of routine operation is reached with the full caseload in the pilot area. The design of this pilot shall provide an opportunity to test all components of the system as well as the data conversion process and system performance. The duration of the pilot must be for a sufficient period of time to thoroughly evaluate the system (usually a minimum duration of three months). The State agency must provide documentation to FNS of the pilot evaluation. FNS approval to implement the system more broadly is a condition for continued FFP.

(iii) Post-implementation Review. After the system is fully implemented, FNS may conduct a review to validate that program policy is correctly applied, whether project goals and objectives were met, that IS equipment and services are being properly used and accurate inventory records exist, and the actual costs of the project.

(h) Disallowance of Federal financial participation (FFP). If FNS finds that any acquisition approved under the provisions of paragraph (c) of this section fails to comply with the criteria, requirements and other undertakings described in the approved or modified APD, payment of FFP may be suspended or may be disallowed in whole or in part.

(i) Emergency acquisition requirements. The State agency may request FFP for the costs of IS equipment and services acquired to meet emergency situations in which the State agency can demonstrate to FNS an immediate need to acquire IS equipment or services in order to continue operation of SNAP; and the State agency can clearly document that the need could not have been anticipated or planned for and precludes the State from following the prior approval requirements of paragraph (c) of this section. FNS may provide FFP in emergency situations if the following conditions are met:

(1) The State agency must submit a written request to FNS prior to the acquisition of any IS equipment or services. The written request shall include:

(i) A brief description of the IS equipment and/or services to be acquired and an estimate of their costs;

(ii) A brief description of the circumstances which result in the State agency's need to proceed with the acquisition prior to fulfilling approval requirements at paragraph (c) of this section; and

(iii) A description of the adverse impact which would result if the State agency does not immediately acquire the IS equipment and/or services.

(2) Upon receipt of a written request for emergency acquisition FNS shall provide a written response to the State agency within 14 days. The FNS response shall:

(i) Inform the State agency that the request has been disapproved and the reason for disapproval; or,

(ii) FNS recognizes that an emergency situation exists and grants conditional approval pending receipt of the State agency's formal submission of the IAPD information specified at paragraph (d)(2) of this section within 90 days from the date of the State agency's initial written request.

(iii) If FNS approves the request submitted under paragraph (i)(1) of this section, FFP will be available from the date the State agency acquires the IS equipment and services.

(iv) If the complete IAPD submission required by paragraph (d)(2) of this section is not received by FNS within 90 days from the date of the initial written request, costs may be subject to disallowance.

(j) General cost requirements—

(1) Cost determination. Actual costs must be determined in compliance with 2 CFR part 200, subpart E and USDA implementing regulations 2 CFR part 400 and part 415 and an FNS approved budget, and must be reconcilable with the approved FNS funding level. A State agency shall not claim reimbursement for costs charged to any other Federal program or uses of IS systems for purposes not connected with SNAP. The approved APD cost allocation plan includes the methods which will be used to identify and classify costs to be claimed. This methodology must be submitted to FNS as part of the request for FNS approval of funding as required in paragraph (d) of this section. Operational costs are to be allocated based on the statewide cost allocation plan rather than the APD cost plan. Approved cost allocation plans for ongoing operational costs shall not apply to IS system development costs under this section unless documentation required under paragraph (c) of this section is submitted to and approvals are obtained from FNS. Any APD–related costs approved by FNS shall be excluded in determining the State agency's administrative costs under any other section of this part.

(2) Cost identification for purposes of FFP claims. State agencies shall assign and claim the costs incurred under an approved APD in accordance with the following criteria:

(i) Development costs. Using its normal departmental accounting system, in accordance with the cost principles set forth in 2 CFR part 200, subpart E and USDA implementing regulations 2 CFR part 400 and part 415, the State agency shall specifically identify what items of costs constitute development costs, assign these costs to specific project cost centers, and distribute these costs to funding sources based on the specific identification, assignment and distribution outlined in the approved APD. The methods for distributing costs set forth in the APD should provide for assigning identifiable costs, to the extent practicable, directly to program/functions. The State agency shall amend the cost allocation plan required by § 277.9 (administrative cost principles) to include the approved APD methodology for the identification, assignment and distribution of the development costs.

(ii) Operational costs. Costs incurred for the operation of an IS shall be identified and assigned by the State agency to funding sources in accordance with the approved cost allocation plan required by § 277.9 (administrative cost principles).

(iii) Service agreement costs. States that operate a central data processing facility shall use their approved central service cost allocation plan required by 2 CFR part 200, subpart E and USDA implementing regulations 2 CFR part 400 and part 415 to identify and assign costs incurred under service agreements with the State agency. The State agency shall then distribute these costs to funding sources in accordance with paragraphs (j)(2)(i) and (ii) of this section.

(3) Capital expenditures. The State agency shall charge the costs of IT equipment having unit acquisition costs or total aggregate costs, at the time of acquisition, of more than $25,000 by means of depreciation or use allowance, unless a waiver is specifically granted by FNS. If the equipment acquisition is part of an APD that is subject to the prior approval requirements of paragraph (c)(2) of this section, the State agency may submit the waiver request as part of the APD.

(4) Claiming costs. Prior to claiming funding under this section the State agency shall have complied with the requirements for obtaining approval and prior approval of paragraph (c) of this section.

(5) Budget authority. FNS approval of requests for funding shall provide notification to the State agency of the budget authority and dollar limitations under which such funding may be claimed. FNS shall provide this amount as a total authorization for such funding which may not be exceeded unless amended by FNS. FNS's determination of the amount of this authorization shall be based on the budget submitted by the State agency. Activities not included in the approved budget, as well as continuation of approved activities beyond scheduled deadlines in the approved plan, shall require FNS approval of an As Needed APD Update as prescribed in paragraphs (c)(3)(i)(D) and (d)(4) of this section, including an amended State budget. Requests to amend the budget authorization approved by FNS shall be submitted to FNS prior to claiming such expenses.

(k) Access to the system and records. Access to the system in all aspects, including but not limited to design, development, and operation, including work performed by any source, and including cost records of contractors and subcontractors, shall be made available by the State agency to FNS or its authorized representatives at intervals as are deemed necessary by FNS, in order to determine whether the conditions for approval are being met and to determine the efficiency, economy and effectiveness of the system. Failure to provide full access to all parts of the system may result in suspension and/or termination of SNAP funds for the costs of the system and its operation.

(l) Ownership rights—

(1) Software.

(i) The State or local government shall include a clause in all procurement instruments which provides that the State or local government shall have all ownership rights in any software or modifications thereof and associated documentation designed, developed or installed with FFP under this section.

(ii) FNS reserves a royalty-free, nonexclusive, and irrevocable license to reproduce, publish or otherwise use and to authorize others to use for Federal Government purposes, such software, modifications and documentation.

(iii) Proprietary operating/vendor software packages which meet the definition of COTS at paragraph (b) of this section shall not be subject to the ownership provisions in paragraphs (l)(1)(i) and (l)(1)(ii) of this section. FFP is not available for development costs for proprietary application software developed specifically for SNAP.

(2) Information Systems equipment. The policies and procedures governing title, use and disposition of property purchased with FFP, which appear at § 277.13 (Property) are applicable to IS equipment.

(m) Information system security requirements and review process—

(1) Information system security requirements. State and local agencies are responsible for the security of all IS projects under development, and operational systems involved in the administration of SNAP. State and local agencies shall determine appropriate IS security requirements based on recognized industry standards or compliance with standards governing security of Federal information systems and information processing.

(2) Information security program. State agencies shall implement and maintain a comprehensive Security Program for IS and installations involved in the administration of the SNAP. Security Programs shall include the following components:

(i) Determination and implementation of appropriate security requirements as prescribed in paragraph (m)(1) of this section.

(ii) Establishment of a security plan and, as appropriate, policies and procedures to address the following areas of IS security:

(A) Physical security of IS resources;

(B) Equipment security to protect equipment from theft and unauthorized use;

(C) Software and data security;

(D) Telecommunications security;

(E) Personnel security;

(F) Contingency plans to meet critical processing needs in the event of short- or long-term interruption of service;

(G) Emergency preparedness; and

(H) Designation of an Agency IS Security Manager.

(iii) Periodic risk analyses. State agencies shall establish and maintain a program for conducting periodic risk analyses to ensure that appropriate, cost-effective safeguards are incorporated into new and existing systems. In addition, risk analyses shall be performed whenever significant system changes occur.

(3) IS security reviews. State agencies shall review the security of IS involved in the administration of SNAP on a biennial basis. At a minimum, the reviews shall include an evaluation of physical and data security, operating procedures and personnel practices. State agencies shall maintain reports of their biennial IS security reviews, together with pertinent supporting documentation, for Federal review upon request.

(4) *Applicability.* The security requirements of this section apply to all IS systems used by State and local governments to administer SNAP.

**Credits**

[Amdt. 201, 47 FR 25499, June 11, 1982; 50 FR 20550, May 17, 1985; 52 FR 35227, Sept. 18, 1987; Amdt. 319, 55 FR 4355, Feb. 7, 1990; Amdt. 345, 57 FR 11259, April 1, 1992; Amdt. 342, 59 FR 2733, Jan. 19, 1994; Amdt. 368, 61 FR 33643, June 28, 1996; Amdt. 385, 65 FR 33440, May 24, 2000; 79 FR 12, Jan. 2, 2014; 79 FR 28606, May 19, 2014; 81 FR 66499, Sept. 28, 2016]

SOURCE: Amdt. 188, 45 FR 85702, Dec. 30, 1980; 51 FR 10782, March 28, 1986; 51 FR 42994, Nov. 28, 1986; 56 FR 12845, March 28, 1991; 58 FR 215, Jan. 5, 1993; Amdt. 373, 64 FR 38293, July 16, 1999; 82 FR 2034, Jan. 6, 2017; 82 FR 11131, Feb. 21, 2017; 85 FR 52031, Aug. 24, 2020, unless otherwise noted.

AUTHORITY: 7 U.S.C. 2011–2036.

Current through Dec. 12, 2023, 88 FR 86255. Some sections may be more current. See credits for details.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX 4

## Sections of Texas Administrative Code

Texas Administrative Code
    Title 1. Administration
        Part 15. Texas Health and Human Services Commission
            Chapter 357. Hearings
                Subchapter A. Uniform Fair Hearing Rules

1 TAC § 357.9

§ 357.9. Burden of Proof in a Fair Hearing

Currentness

The burden of proof in a fair hearing regarding a specific issue is proof by a preponderance of the evidence. The party that bears the burden of proof meets the burden if the stronger evidence, on the whole, favors that party, as determined by the hearings officer. Depending on the type of hearing, the following apply:

(1) The agency or its designee bears the burden of proof.

(2) The nursing facility bears the burden of proof in transfer and discharge hearings.

**Credits**
**Source:** The provisions of this §357.9 adopted to be effective June 29, 2009, 34 TexReg 4292.

Current through 50 Tex.Reg. No. 802, dated February 7, 2025, as effective on or before February 14, 2025. Some sections may be more current. See credits for details.

1 TAC § 357.9, 1 TX ADC § 357.9

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Texas Administrative Code
  Title 1. Administration
    Part 15. Texas Health and Human Services Commission
      Chapter 372. Temporary Assistance for Needy Families and Supplemental Nutrition Assistance Programs
        Subchapter F. Benefits
          Division 1. Benefits in General

1 TAC § 372.1521

§ 372.1521. Account Balance and Transaction Errors

Currentness

(a) For purposes of this section, the term "system error" means an error resulting from a malfunction at any point in the redemption process: from the system host computer, to the switch, to the third-party processors, to a store's host computer or point-of-sale terminal. It includes both Electronic Benefit Transfer (EBT) account balance errors and EBT program transaction errors. The error may occur after the availability date and may result in either a debit or credit to the household.

(b) A TANF or SNAP household has 90 calendar days from the date of a system error transaction to request an adjustment.

(c) To request an adjustment, the household must contact the EBT call center's toll-free number to report an EBT account balance error or an EBT program transaction error for resolution by the EBT contractor as described in this chapter.

(d) The EBT contractor must notify the TANF or SNAP household in writing of its determination of the EBT account balance or EBT program transaction error.

    (1) If the determination is that the household was overpaid, the EBT contractor will make the appropriate adjustment within 15 calendar days.

    (2) If the determination is that the household is owed funds, the EBT contractor will make the adjustment within 10 business days of the date of notification.

(e) If the household disagrees with the decision, the household may contact the Texas Health and Human Services Commission (HHSC) Lone Star Business Services (LSBS) for a second review. The household retains the right to a fair hearing if requested within 90 days from the date of the notice from the EBT contractor.

(f) If a TANF or SNAP household disagrees with the HHSC LSBS determination, the household has 90 days from the date of the EBT contractor' s determination to request a fair hearing as provided in HHSC's fair hearing rules in Chapter 357 of this title (relating to Hearings).

**Credits**

**Source:** The provisions of this §372.1521 adopted to be effective September 1, 2009, 34 TexReg 5361; amended to be effective October 1, 2015, 40 TexReg 6350.

Current through 48 Tex.Reg. No. 6804, dated November 17, 2023, as effective on or before November 24, 2023. Some sections may be more current. See credits for details.

1 TAC § 372.1521, 1 TX ADC § 372.1521

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX 5

**Texas Works Handbook**

**§ B-341**

# B-341 Agency Replacements

Revision 23-3; Effective July 1, 2023

**TANF and SNAP**

HHSC designs the EBT systems  and issuance procedures to minimize loss and theft of SNAP and TANF household benefits. HHSC is required to issue agency replacement benefits only if the loss occurred:

- after the household reports the Lone Star Card lost or stolen and HHSC or an HHSC contractor failed to cancel the household's Lone Star Card;
- because of an HHSC local office Lone Star Card issuance error; or
- because of an unlawful or other erroneous action on the part of HHSC or an HHSC contractor.

**Related Policy**

Documentation Requirements, B-390

# APPENDIX 6

**Texas statutes from**

**Texas Government Code**

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 2. Judicial Branch (Refs & Annos)
      Subtitle A. Courts
        Chapter 22. Appellate Courts
          Subchapter C. Courts of Appeals (Refs & Annos)

V.T.C.A., Government Code § 22.220

§ 22.220. Civil Jurisdiction

Currentness

(a) Except as provided by Subsection (d), each court of appeals has appellate jurisdiction of all civil cases within its district of which the district courts or county courts have jurisdiction when the amount in controversy or the judgment rendered exceeds $250, exclusive of interest and costs.

(b) If a court of appeals having jurisdiction in a case, matter, or controversy that requires immediate action is unable to take immediate action because the illness, absence, or unavailability of the justices causes fewer than three members of the court to be present, the nearest available court of appeals, under rules prescribed by the supreme court, may take the action required in the case, matter, or controversy.

(c) Each court of appeals may, on affidavit or otherwise, as the court may determine, ascertain the matters of fact that are necessary to the proper exercise of its jurisdiction.

(d) The Court of Appeals for the Fifteenth Court of Appeals District has exclusive intermediate appellate jurisdiction over the following matters arising out of or related to a civil case:

(1) matters brought by or against the state or a board, commission, department, office, or other agency in the executive branch of the state government, including a university system or institution of higher education as defined by Section 61.003, Education Code, or by or against an officer or employee of the state or a board, commission, department, office, or other agency in the executive branch of the state government arising out of that officer's or employee's official conduct, other than:

(A) a proceeding brought under the Family Code and any related motion or proceeding;

(B) a proceeding brought under Chapter 7B or Article 17.292, Code of Criminal Procedure;

(C) a proceeding brought against a district attorney, a criminal district attorney, or a county attorney with criminal jurisdiction;

(D) a proceeding relating to a mental health commitment;

(E) a proceeding relating to civil asset forfeiture;

(F) a condemnation proceeding for the acquisition of land or a proceeding related to eminent domain;

(G) a proceeding brought under Chapter 101, Civil Practice and Remedies Code;

(H) a claim of personal injury or wrongful death;

(I) a proceeding brought under Chapter 125, Civil Practice and Remedies Code, to enjoin a common nuisance;

(J) a proceeding brought under Chapter 55, Code of Criminal Procedure;

(K) a proceeding under Chapter 22A, Government Code;

(L) a proceeding brought under Subchapter E-1, Chapter 411, Government Code;

(M) a proceeding brought under Chapter 21, Labor Code;

(N) a removal action under Chapter 87, Local Government Code; or

(O) a proceeding brought under Chapter 841, Health and Safety Code;

(2) matters in which a party to the proceeding files a petition, motion, or other pleading challenging the constitutionality or validity of a state statute or rule and the attorney general is a party to the case; and

(3) any other matter as provided by law.

**Credits**
Acts 1985, 69th Leg., ch. 480, § 1, eff. Sept. 1, 1985. Amended by Acts 2009, 81st Leg., ch. 1351, § 3, eff. Sept. 1, 2009; Acts 2023, 88th Leg., ch. 459 (S.B. 1045), § 1.05, eff. Sept. 1, 2023.

Notes of Decisions (391)

**O'CONNOR'S CROSS REFERENCES**
See also TRAP 25.1, 27a.

V. T. C. A., Government Code § 22.220, TX GOVT § 22.220
Current through legislation effective May 20, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title. 10. General Government (Refs & Annos)
      Subtitle A. Administrative Procedure and Practice
        Chapter 2001. Administrative Procedure (Refs & Annos)
          Subchapter G. Contested Cases: Judicial Review (Refs & Annos)

V.T.C.A., Government Code § 2001.171

§ 2001.171. Judicial Review

Currentness

A person who has exhausted all administrative remedies available within a state agency and who is aggrieved by a final decision in a contested case is entitled to judicial review under this chapter.

**Credits**

Added by Acts 1993, 73rd Leg., ch. 268, § 1, eff. Sept. 1, 1993.

Notes of Decisions (361)

**O'CONNOR'S CROSS REFERENCES**

See also *O'Connor's Texas COA*, "Administrative remedies," ch. 24-A, §2.8.

V. T. C. A., Government Code § 2001.171, TX GOVT § 2001.171
Current through legislation effective May 20, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 10. General Government (Refs & Annos)
      Subtitle A. Administrative Procedure and Practice
        Chapter 2001. Administrative Procedure (Refs & Annos)
          Subchapter G. Contested Cases: Judicial Review (Refs & Annos)

V.T.C.A., Government Code § 2001.174

§ 2001.174. Review Under Substantial Evidence Rule or Undefined Scope of Review

Currentness

If the law authorizes review of a decision in a contested case under the substantial evidence rule or if the law does not define the scope of judicial review, a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:

(1) may affirm the agency decision in whole or in part; and

(2) shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(A) in violation of a constitutional or statutory provision;

(B) in excess of the agency's statutory authority;

(C) made through unlawful procedure;

(D) affected by other error of law;

(E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

**Credits**
Added by Acts 1993, 73rd Leg., ch. 268, § 1, eff. Sept. 1, 1993.

Notes of Decisions (511)

**O'CONNOR'S CROSS REFERENCES**

See also *O'Connor's Texas COA*, "Administrative remedies," ch. 24-A, §2.8.

V. T. C. A., Government Code § 2001.174, TX GOVT § 2001.174

Current through the end of the 2023 Regular and Second Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jenifer Taylor on behalf of Elizabeth Ewing
Bar No. 24092396
jtaylor@lonestarlegal.org
Envelope ID: 101181739
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: Appelle's Brief
Status as of 5/22/2025 4:57 PM CST

Associated Case Party: Texas Health an Human Services Commission

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Victoria Gomez | | victoria.gomez@oag.texas.gov | 5/22/2025 4:39:13 PM | SENT |
| Jennifer Cook | | Jennifer.Cook@oag.texas.gov | 5/22/2025 4:39:13 PM | SENT |

Associated Case Party: Shanressa  Craddock

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| David Beyleryan | | dbeyleryan@lonestarlegal.org | 5/22/2025 4:39:13 PM | SENT |
| Elizabeth Ewing | | eewing@lonestarlegal.org | 5/22/2025 4:39:13 PM | SENT |